[No. B195402. Second Dist., Div. Three. Dec. 10, 2007.]

ROBERT NIELSEN et al., Plaintiffs and Appellants, v.
PAUL A. BECK et al., Defendants and Respondents.

**COUNSEL**

Hawkins, Prata & Daley, Robert J. Prata, John F. Morning and Cassandra J. Zappaterreno for Plaintiffs and Appellants.

Baker, Keener & Nahra, Robert C. Baker, Mitchell F. Mulbarger and James D. Hepworth for Defendants and Respondents.

**OPINION**

**ALDRICH, J.—**

I

## INTRODUCTION

Summary judgment was entered in favor of defendants and respondents Paul A. Beck and the law firm of Ben-Zvi & Beck, LLP (collectively, Beck), and against plaintiffs and appellants Robert Nielsen and William Nielsen (collectively, the Nielsens).

The issue we address in this legal malpractice case is whether there are triable issues of fact with regard to the statute of limitations. The resolution of this issue centers upon subdivision (a)(2) of Code of Civil Procedure section 340.6 that tolls the statute if an attorney "continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred."

We reverse because there are triable issues of fact.

## II

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts.*[1]

### 1. *The initial retention of Beck.*

The Nielsens owned PrimePapers, Inc. (PrimePapers), a company that cuts rolls of paper used by other commercial interests.

Attorney Richard Berger referred the Nielsens to Beck to assist with the potential bankruptcy of PrimePapers. Beck was hired by PrimePapers and its affiliate entity, PrimePapers Louisiana (PPL). The April 11, 2003, written fee agreement stated that Beck was to represent PrimePapers and PPL "in connection with a number of pending legal issues, including but not limited to the defense of claims brought against the Company by various creditors and the resolution of the Company's outstanding obligations to its creditors through a workout or Chapter 11 or Chapter 7 bankruptcy filing."

By May 1, 2003, PrimePapers's creditors had forced the company into involuntary bankruptcy. The bankruptcy proceedings were converted into a chapter 11 reorganization and thereafter into a chapter 7 liquidation. On March 23, 2004, the bankruptcy court entered an order closing the case.

### 2. *The ProLogis action.*

PrimePapers leased a building in Rancho Cucamonga, California from ProLogis California I, LLC (ProLogis). The lease for the premises contained a provision whereby ProLogis would waive a large amount of rent. However, in the event of default, this "free rent" had to be paid. The Nielsens personally guaranteed the lease.

Shortly after Beck was retained, Beck advised the Nielsens to stop making rent payments to ProLogis. In April 2003, ProLogis filed an unlawful detainer action against PrimePapers, PPL, and the Nielsens in the San Bernardino Superior Court.

In June 2003, Beck began representing PrimePapers, PPL, and the Nielsens in connection with the unlawful detainer action. The June 20, 2003, written

---

[1] Following the appropriate standard for review from a summary judgment, we view the facts in the light most favorable to the Nielsens as they opposed the summary judgment motion. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1520 [80 Cal.Rptr.2d 94]; *Daniels v. DeSimone* (1993) 13 Cal.App.4th 600, 606 [16 Cal.Rptr.2d 615].)

fee agreement recognized that "[p]ursuant to our engagement several months ago on behalf of PrimePapers . . . we are already representing [PrimePapers] as the primary defendant in the Landlord Action, which has been enjoined pursuant to . . . the bankruptcy case . . . ." Beck described the representation as follows: "I was already representing [PrimePapers] in connection with its relationship with the landlord. This engagement authorized me to . . . be retained on behalf of PPL and the Nielsens individually who were guarantors of or otherwise on the ProLogis lease."

On September 2, 2003, the San Bernardino trial court found against PPL on the issue of possession and against the Nielsens in the amount of $394,840.42. In issuing a judgment in that amount, the trial court recognized that PrimePapers was in bankruptcy.

Beck continued to provide professional services to PrimePapers, PPL, and the Nielsens in attempts to settle the unlawful detainer case and to avoid enforcement proceedings by ProLogis, the judgment creditor.

3.   *The substitution of attorney.*

On August 19 and 23, 2004, Beck met with Attorney Jerry Zack, an attorney in Ronald Slates's law firm. Beck gave Attorney Zack his files and materials relating to the unlawful detainer case.

By this time, Robert Nielsen was unhappy with the professional services rendered by Beck. He had lost confidence in Beck's abilities. Robert Nielsen believed Beck had lied, was unprepared for the ProLogis trial, had caused the adverse verdict, and had provided confidential information to a third party. There is conflicting evidence as to whether he ever communicated his dissatisfaction to Beck.[2]

---

[2] In his deposition, Robert Nielsen testified to the following:

"Q. And did you make any complaints about how you felt Mr. Beck was representing you during that time period?

"A. I may have."

However, Robert Nielsen also testified to the following:

"Q. How did you learn about the result of the [unlawful detainer] trial?

"A. He casually walked in the front door of our offices and advised Bill and [me that] we just had a judgment put on us of $389,000.

"Q. Were you upset about the manner in which he walked through the door of your premises?

"A. I was upset about the inability of him as a lawyer to represent us properly in this matter.

"Q. Did you inform him of your feelings?

"A. Oh, I'm sure he had a feel[ing].

"Q. Did you inform him of your feelings?

"A. No, I did not."

On August 26, 2004, the Nielsens and Beck executed a substitution of attorney form to replace Beck with Attorney Slates. The substitution of attorney form was returned to Attorney Slates and then filed with the superior court on September 3, 2004.

According to Robert Nielsen, at the time the substitution of attorney form was signed, he "felt very uncomfortable for [Beck] to do any more work for me. Everything that [Beck] touched, it continued to get worse and worse and worse." However, after August 26, 2004, Beck continued to work for the Nielsens.

On September 9, 14, and 18, 2004, Robert Nielsen contacted Beck by telephone concerning appropriate tactics and procedures in resolving the ProLogis claims.

On October 14, 2004, Beck mailed a bill to Robert Nielsen for professional services. The bill requested payment of $350 for one hour of "professional services rendered" as follows:

|  |  | "Hours |
|---|---|---|
| "9/9/04 | Telephone conference with Bob re negotiations with [ProLogis]. | 0.40 |
| "9/14/04 | Telephone call from Bob re [ProLogis] negotiations, options and strategy. | 0.20 |
| "9/18/04 | Telephone call from Bob re [ProLogis] negotiation strategy." | 0.40 |

In his deposition, Beck described the conversations on September 9, 14, and 18, 2004, as follows:

"Q. [Referring to the October 14, 2004, billing statement] is this for work you did in the ProLogis matter?

"A. It represents exactly what it says. I had three telephone conversations with Mr. Nielsen. . . . I was a bit surprised to hear from [Robert Nielsen] after I was substituted out, but he called me to tell me what was going on with Mr. Slates and/or Mr. Zack and their efforts to negotiate with [ProLogis]. I don't know that he asked me anything other than to tell me what they were doing and asked me if that was the right procedure to follow. It's kind of checking up on his new lawyers with me, the way he would check up on me with Dick Berger.

"Q. Do you remember anything else that was discussed with him in these series of phone calls with [Robert] Nielsen other than what you've already testified to?

"A. Based upon these descriptions, all three of them concerned the status of negotiations and negotiating strategy with respect to [ProLogis]. Those negotiations were being conducted by Mr. Slates or Mr. Zack.

"I see that on December 14 there's a reference to options. I had testified earlier that I had informed Mr. Nielsen that he had the options among others of a personal bankruptcy filing. I probably—without recalling specifically, I may well have reminded him that that was an option, but I did not consider myself to be rendering advice at this point. I was simply documenting the fact that he had contacted me, because I wanted to show him that I was still trying to be responsive to him although I was no longer his counsel."[3]

B. *Procedure.*

On September 2, 2005, the Nielsens filed this legal malpractice action against Beck. The complaint sought damages for representation with regard to the bankruptcy and ProLogis cases.

Beck filed a motion for summary judgment contending that the lawsuit was barred by the one-year statute of limitations contained in Code of Civil Procedure section 340.6. In opposing the motion, the Nielsens argued that the statute of limitations was tolled under the "continuous representation" rule codified in subdivision (a)(2) of section 340.6.

The trial court granted the motion for summary judgment. The Nielsens appeal from the subsequently entered judgment. We reverse.

---

[3] In his subsequently drafted declaration, Beck declared in part: "In September 2004 . . . I received several telephone calls from Robert Nielsen. . . . In these conversations, Mr. Nielsen informed me of the status of the case and the actions being taken by Mr. Zack, as well as expressing his continuing hope that Mr. Zack would be able to negotiate a settlement of the unlawful detainer judgment with ProLogis' assignee. At no time did Mr. Nielsen ask me to substitute back into the case or associate with Mr. Zack, negotiate with opposing counsel, file any papers with the Court, assist in any other manner, or even place a telephone call to the Slates office. At that point, I did not consider myself to be acting as the Nielsens' attorney, since my firm already had been substituted out of the case when I received these telephone calls . . . . However, I believed that professional courtesy called for me to take his telephone calls, even though my firm was no longer serving as counsel."

### III

### DISCUSSION

#### A. *Standard of review.*

Summary judgment is properly granted where there are no triable issues of fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision granting a summary judgment de novo. In doing so, we liberally construe all conflicting facts in the light most favorable to the party opposing the motion. (*Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1348–1349 [42 Cal.Rptr.3d 283]; *Crouse v. Brobeck, Phleger & Harrison, supra,* 67 Cal.App.4th at p. 1520; *Daniels v. DeSimone, supra,* 13 Cal.App.4th at pp. 606–607.)

#### B. *The continuing representation tolling provision of Code of Civil Procedure section 340.6.*

Code of Civil Procedure section 340.6 sets forth the statute of limitations for legal malpractice. Section 340.6, subdivision (a)(2) states that "[a]n action against an attorney for a wrongful act or omission . . . arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first. In no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that . . . [¶] . . . [¶] [t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred . . . ."

In *Laird v. Blacker* (1992) 2 Cal.4th 606, 618 [7 Cal.Rptr.2d 550, 828 P.2d 691], the Supreme Court quoted the legislative history in enunciating the purposes of tolling based on continuous representation. They are "to 'avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error, and to prevent an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired.' [Citation.]" (*Ibid.*; accord, *Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 511 [66 Cal.Rptr.3d 52, 167 P.3d 666].)

"Code of Civil Procedure section 340.6 does not expressly state a standard to determine when an attorney's representation of a client regarding a specific subject matter continues or when the representation ends, and the legislative

history does not explicitly address this question." (*Gonzalez v. Kalu* (2006) 140 Cal.App.4th 21, 28 [43 Cal.Rptr.3d 866] (*Gonzalez*).) However, a number of recent cases have addressed this standard.

*Worthington v. Rusconi* (1994) 29 Cal.App.4th 1488 [35 Cal.Rptr.2d 169] (*Worthington*), as followed by *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875 [110 Cal.Rptr.2d 877] (*Lockley*), properly enunciated the reasons for using an objective standard in malpractice cases generally. " 'Ordinarily, an attorney's representation is not completed until the agreed tasks or events have occurred, the client consents to termination or a court grants an application by counsel for withdrawal.' (2 Mallen & Smith, Legal Malpractice [(3d ed. 1989)] Statutes of Limitations, . . . § 18.12, p. 120.) 'The rule is that, for purposes of the statute of limitations, the attorney's representation is concluded when the parties so agree, and that result does not depend upon formal termination, such as withdrawing as counsel of record.' (*Id.* at p. 121; accord, *Shapero v. Fliegel* [(1987)] 191 Cal.App.3d [842,] 848 [236 Cal.Rptr. 696] [the failure to formally withdraw as attorney of record, standing alone, will not toll the statute of limitations under the rubric of continued representation]; *Hensley* v. *Caietti* [(1993)] 13 Cal.App.4th [1165,] 1173 [16 Cal.Rptr.2d 837] ['[t]he period of tolling should not turn upon the fortuity of the time of delivery of notice of discharge to counsel . . . .'].)" (*Worthington, supra,* at p. 1497.) "Continuity of representation ultimately depends, not on the client's subjective beliefs, but rather on evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship." (*Worthington, supra,* at p. 1498, fn. omitted; accord, *Lockley, supra,* at p. 887.)

The limitations period can be tolled even though the client is aware of the attorney's negligence. (*O'Neill v. Tichy* (1993) 19 Cal.App.4th 114, 120–121 [25 Cal.Rptr.2d 162].) Also, "consulting another attorney is not tantamount to ending a prior relationship, the court will not use that occurrence as a benchmark which, standing alone, signals the termination of the attorney and client's relationship." (*Worthington, supra,* 29 Cal.App.4th at p. 1498, fn. 6.) However, "not . . . [every] contact between an attorney and his client amounts to representation." (*Gurkewitz v. Haberman* (1982) 137 Cal.App.3d 328, 334 [187 Cal.Rptr. 14].) When contact manifests "an ongoing *mutual* relationship and . . . activities in furtherance of the relationship," then there can be a continuing relationship such that the tolling provision is to be applied. (*Worthington, supra,* at p. 1498.)

In our recent case of *Gonzalez, supra,* 140 Cal.App.4th 21, an attorney abandoned a client. We held that in such situations, "continuous representation should be viewed objectively from the client's perspective . . . ." (*Id.* at p. 31.) This objective standard examines the evidence through the eyes of the

client and is appropriate because otherwise an attorney could abandon a client without the client's knowledge, and yet escape a legal malpractice lawsuit. In abandonment cases, the purpose of the rule would be obliterated. Thus, the crucial inquiry in abandonment cases is "when the client actually has or reasonably should have no expectation that the attorney will provide further legal services. [Citation.]" (*Id.* at p. 30.)

In *Gonzalez,* we did not mean to suggest that the standard, which is to be viewed from the client's perspective, is to be applied universally, in all cases. Rather, we compared abandonment cases to other types of malpractice lawsuits. In *Gonzalez,* we noted that "[i]n both *Worthington* and *Lockley* . . . there were continuing contacts between the attorney and client regarding the specific subject matter of the representation. *Worthington* and *Lockley* held that those contacts established continuing representation and did not rule on the question whether an attorney's representation of a client can continue when there are no contacts. (*Worthington, supra,* [29 Cal.App.4th] at p. 1498; *Lockley, supra,* [91 Cal.App.4th] at pp. 889–891.)" (*Gonzalez, supra,* 140 Cal.App.4th at p. 30.)[4]

Thus, the inquiry in the matter before us is whether, using an objective standard, there are triable issues of fact about whether there was an ongoing relationship and activities in furtherance of the relationship. We now turn to that inquiry.

    C.   *There are triable issues of fact with regard to the statute of limitations.*

We agree with the Nielsens that there are triable issues of fact with regard to tolling the statute of limitations.

        1.   *There are triable issues of fact as to whether there was evidence of an ongoing mutual relationship and activities in furtherance of that relationship.*

To satisfy the one-year provision of Code of Civil Procedure section 340.6, the Nielsens' legal malpractice case had to be filed within one year after the Nielsens discovered, or through reasonable diligence should have discovered,

---

[4] Thus, we disagree with the subjective standard articulated in *Hensley v. Caietti* (1993) 13 Cal.App.4th 1165 [16 Cal.Rptr.2d 837] insofar as it applies a subjective standard. In *Gonzalez, supra,* 140 Cal.App.4th at page 29 and in footnote 7, we also disagreed with *Hensley v. Caietti* and *Shapero v. Fliegel, supra,* 191 Cal.App.3d 842, insofar as they incorrectly read and applied statements from *Shumsky v. Eisenstein* (2001) 96 N.Y.2d 164 [726 N.Y.S.2d 365, 750 N.E.2d 67].

the negligence of Beck, unless the statute was tolled pursuant to section 340.6, subdivision (a)(2) because Beck continued to represent the Nielsens.

There is evidence that Robert Nielsen was dissatisfied with Beck's representation as early as August 2004. The Nielsens' legal malpractice lawsuit was filed on September 2, 2005. The Nielsens contend that the statute of limitations had not expired because the substitution of attorney form was not filed until September 3, 2004, and even if the statute had expired, it was tolled because Beck continued to represent them.

■ A strong argument can be made that the statute of limitations could not extend any later than August 26, 2004, when the substitution of attorney form was executed because it demonstrated that the ongoing relationship between Beck and the Nielsens had ended and Beck would no longer be rendering legal advice. However, there is contrary evidence from which a trier of fact could conclude that the relationship between Beck and the Nielsens had not been severed at the time the substitution of attorney form was signed, but rather, the statute was tolled through September 18, 2004.

On September 9, 14, and 18, 2004, Robert Nielsen placed telephone calls to Beck asking for advice. There is evidence that during these three telephone calls, Beck rendered professional services. Beck's October 2004 billing statement requested payment for "professional services rendered" and described the services Beck rendered as "negotiations, options and strategy." Beck testified in his deposition that during these telephone calls, Robert Nielsen asked for advice as to procedure, negotiations, and tactics to resolve the ProLogis case, and Beck was responsive to those requests. Thus, there is evidence from which a trier of fact could conclude that there was an ongoing mutual relationship and activities in furtherance of that relationship through September 18, 2004. If the trier of fact so concludes, then the statute of limitations would not have expired because the lawsuit was filed on September 2, 2005. (Cf. *O'Neill v. Tichy, supra*, 19 Cal.App.4th 114 [client's awareness of the attorney's negligence and retention of malpractice attorney does not interrupt the tolling of the limitations period as long as client permits attorney to continue representing client regarding the specific subject matter in which the alleged negligence occurred].)

Beck argues that the statute of limitations had expired. Beck asserts that Robert Nielsen considered the relationship to be over, and in fact it was over, by the time Attorney Slates was hired and the substitution of attorney form was signed on August 26, 2004. (E.g., *Rubinstein v. Barnes* (1987) 195 Cal.App.3d 276, 283–284 [240 Cal.Rptr. 535] [statute not tolled where attorney represented client in dissolution, client considered representation over once decree entered even though thereafter client telephoned attorney

once regarding support payments, but client did not ask attorney to take any action].) Beck states that he was simply being cordial when he discussed the pending litigation with Robert Nielsen and that the three conversations do not evidence a continuing relationship. This may be the conclusion that a trier of fact reaches. However, the fact that Robert Nielsen continued to ask Beck for advice even after the substitution of attorney form was signed, and Beck apparently provided advice, creates sufficient evidence that may convince a trier of fact to the contrary.[5]

Further, the signing and filing of the substitution of attorney form in this case may not be the key to the analysis.[6] A reasonable trier of fact could conclude that the parties intended that Beck no longer act as litigation counsel, but he was expected to continue to provide transactional advice, as evidenced by the three September 2004 telephone calls. After all, Beck not only provided legal services, but he billed for that advice. (*Worthington, supra,* 29 Cal.App.4th 1488 [triable issue of fact regarding tolling when client consults with new attorney, but retained counsel continued thereafter to provide services].)

There are triable issues of fact relating to whether there was an ongoing mutual relationship and activities in furtherance of that relationship through September 18, 2004.

2. *There are triable issues of fact with regard to the scope of the representation.*

In addition to the issue of timing, in order to fall within the tolling provision of Code of Civil Procedure section 340.6, subdivision (a)(2), the

---

[5] Beck argues that the statute began to run on August 26, 2004, because on that date Robert Nielsen no longer wanted Beck to perform any more legal work. As we discussed, there is evidence that Robert Nielsen sought and received advice after that date, raising a triable issue of fact. In any event, the testimony relied upon by Beck is ambiguous. The testimony is as follows:

"Q. All right. By August 26, 2004, you didn't want Mr. Beck doing any legal work on your behalf; correct?

"[Nielsen's counsel]: Objection. In its present form, it's an argumentative question, vague and ambiguous.

"I want to say that there have been service invoices generated by Mr. Beck subsequent to August 26th for services that he rendered. Correct me if I'm wrong, but—

"Q. Go ahead sir.

"A. You are correct."

[6] The Nielsens recognize that the substitution of attorney form may play a pivotal role in the ultimate outcome of this case. They suggest that, contrary to Beck's position, the crucial date is when this form was filed, and not when it was signed. This dispute will be for the trier of fact to resolve, along with the significance of the events that occurred on September 9, 14, and 18, 2004.

attorney must have continued "to represent the plaintiff regarding the *specific subject matter*" (§ 340.6, subd. (a)(2), italics added) as to which the negligence occurred. "Once representation on that matter ends, a client must bring timely suit, notwithstanding that the attorney may continue to represent the client on a range of matters and a direct suit against the attorney may interfere with the attorney-client relationship in all other such matters." (*Beal Bank, SSB v. Arter & Hadden, LLP, supra,* 42 Cal.4th at p. 514, fn. 8.) The continuing representation tolling provision "is not applicable when there is a continuing relationship between the client and the attorney involving only unrelated matters. [Citation.]" (*Crouse v. Brobeck, Phleger & Harrison, supra,* 67 Cal.App.4th at p. 1528.)

Thus, for example, in *Crouse v. Brobeck, Phleger & Harrison, supra,* 67 Cal.App.4th 1509, an attorney was hired to protect the client's interest in the sale of her limited partnership interest in Med-Trans. The client received a promissory note. The attorney did not deliver the note to the client or assure that it would be held in a secure location. Later, when the terms of the note were to be restructured, the note could not be located and thus could not be surrendered. (*Id.* at pp. 1520–1521.) Eventually there was a different restructuring agreement, which closed on October 12, 1990. Later that month, the client was advised that the loss of the note was caused by the attorney's negligence and the client learned of the significance of the failure to produce the note. However, the attorney continued to represent the client in collecting the escrowed proceeds. (*Id.* at p. 1522.) The appellate court held that for purposes of the statute of limitations, the representation continued through the time services were rendered with regard to the note because these activities concerned restructuring the deal. (*Id.* at pp. 1528–1531.) There was a continuing relationship involving the same specific subject matter.[7]

Beck contends that even if the statute was tolled with respect to the ProLogis litigation, it was not tolled with respect to the earlier representation involving the bankruptcy and reorganization of PrimePapers. This contention is not persuasive because there are triable issues of fact as to whether the representation regarded the same specific subject matter.

The first written fee agreement, dated April 11, 2003, stated that Beck was to represent PrimePapers and PPL "in connection with a number of pending legal issues, *including but not limited to* the defense of claims brought against the Company by various creditors and the resolution of the Company's

---

[7] *Crouse v. Brobeck, Phleger & Harrison, supra,* 67 Cal.App.4th 1509, also held that the "continuing representation by a firm's ex-attorney does not toll the statute of limitations against the firm . . . ." (*Beal Bank, SSB v. Arter & Hadden, LLP, supra,* 42 Cal.4th at p. 507.) This holding was recently approved by the Supreme Court. (*Beal Bank, SSB v. Arter & Hadden, LLP, supra,* 42 Cal.4th 503.)

outstanding obligations to its creditors through a workout or Chapter 11 or Chapter 7 bankruptcy filing." (Italics added.)

Pursuant to that representation, Beck advised PrimePapers and the Nielsens (who owned PrimePapers) to cease making payments to the landlord, ProLogis. In turn, ProLogis filed the unlawful detainer action. Beck then provided counsel with regard to the unlawful detainer action.

The second written fee agreement, dated June 20, 2003, reasonably could be construed as a recognition that Beck's representation on the unlawful detainer action was a continuation of, and connected to, the representation of the bankruptcy case. The second fee agreement stated that "[p]ursuant to our engagement several months ago on behalf of PrimePapers . . . we are *already representing* [PrimePapers] as the primary defendant in the Landlord Action, which has been enjoined pursuant to . . . the bankruptcy case . . . ." (Italics added.) This interpretation is also advanced by Beck's deposition testimony in which he described the representation as follows: "I was *already* representing [PrimePapers] *in connection with its relationship with the landlord.* This engagement authorized me to . . . be retained on behalf of PPL and the Nielsens individually who were guarantors of or otherwise on the ProLogis lease." (Italics added.)

Beck's representation in the bankruptcy case and Beck's representation in the unlawful detainer proceedings can be seen to be intertwined and related, having overlapping objectives and purposes. The legal representation could be seen to have arisen from the same event. The advice given by Beck in the bankruptcy case resulted in the unlawful detainer proceeding. Beck advised the Nielsens and PrimePapers to stop paying ProLogis. (*Lockley, supra,* 91 Cal.App.4th 875 [representation relating to workers' compensation claim and with regard to settlement agreement against employer involved same subject matter as they related to the same objective]; *Gold v. Weissman* (2004) 114 Cal.App.4th 1195 [8 Cal.Rptr.3d 480] [same subject matter where representation to file medical malpractice case continued with attorney's agreement to file complaint with Board of Medical Quality Assurance as both arose from the same event and had a shared, common purpose, even though involved different forums and different types of relief]; *Baright v. Willis* (1984) 151 Cal.App.3d 303 [198 Cal.Rptr. 510] [retaining attorney to sue for damages as a result of workplace injury would include third party lawsuit as well as workers' compensation case]; contra, *Panattoni v. Superior Court* (1988) 203 Cal.App.3d 1092 [250 Cal.Rptr. 390].) Thus, even though the bankruptcy case was in a different forum than the unlawful detainer proceedings and involved different parties, from the above stated facts, a trier of fact could conclude that the representation of the Nielsens with regard to the unlawful detainer action involved the same specific subject matter as the bankruptcy action.

## IV

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to the Nielsens.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied January 7, 2008, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied March 12, 2008, S160286. Moreno, J., did not participate therein.