Filed 2/4/14  Drimmer v. Hankin CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| STEVEN DRIMMER, | B246408 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC450623) |
| MARC E. HANKIN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Reversed.

Krane & Smith, Marc Smith and Cynthia R. Hodes for Plaintiff and Appellant.

Waxler♦Carner♦Brodsky, Andrew J. Waxler and Christopher L. Wong for Defendants and Respondents.

Steven Drimmer appeals from the grant of summary judgment in favor of his former attorneys, Marc E. Hankin and Hankin Patent Law, APC (sometimes referred to collectively as Hankin). Because there are triable issues of material fact as to whether Drimmer's action is barred by the statute of limitations, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Underlying Action

Mark Baker and others sued Drimmer, Fred Lowe, Derek Goldberg, and Varitalk, Inc. (Varitalk) for patent infringement in September 2007 (the infringement action). The action was removed to federal district court. (*Baker et al. v. Varitalk, Inc. et al.*, CV-07-6622 VBF (FFM).) Drimmer, Lowe, Goldberg, and Varitalk retained Hankin to represent them.

On May 4, 2009, the day before the infringement action was set for trial, Varitalk filed for Chapter 11 bankruptcy protection, temporarily staying the infringement action. The bankruptcy court granted relief from the stay to allow the infringement action to proceed on October 5, 2009.

On November 6, 2009, Hankin filed a motion to withdraw as counsel of record. In his declaration, Hankin said a conflict of interest had arisen among his clients, and that he had filed a claim against Varitalk for unpaid legal fees. Thus, Hankin said he could no longer represent Varitalk or any of the individual defendants. Further, Hankin said he was informed that "Drimmer, Lowe, and Goldberg all are being advised by other counsel, and that, sooner or later, one or more of those counsel will be seeking to Substitute me out as Counsel of Record for each of the Individual Defendants." Although Hankin had met with his clients about his request to withdraw, "no other attorney has yet stepped in, through formal Substitution of Counsel, to relieve the undersigned and Hankin Patent Law, APC, of its obligation to defend the Defendants and to prosecute the Counterclaims on their behalf."

2

Drimmer did not oppose the motion to withdraw. On December 4, 2009, the trial court granted Hankin's motion and ordered that Hankin was "permitted to withdraw as Counsel of Record on behalf of each of the Individual Defendants."

## II.     The Present Action

### A.     The Complaint

Drimmer filed the present action for legal malpractice and breach of fiduciary duty against Hankin and others on December 3, 2010. The operative second amended complaint, filed September 28, 2011, alleged that Hankin failed to exercise reasonable care by "[failing to disclose that] their simultaneous representation of [Drimmer], on the one hand, and Varitalk, Lowe and Goldberg, on the other, constituted a conflict of interest since each of the parties represented by them had different and conflicting objectives, rights and liabilities," "failing to adequately defend and represent [Drimmer] in the Varitalk Action," "failing to pursue [Drimmer's] claims against prior patent counsel," "failing to advise [Drimmer] that rejection of reasonable settlement demands made to the Varitalk Parties in the Varitalk Action could expose [Drimmer] to substantial liability," "failing to advise [Drimmer] that such settlement would have resolved the claims against [Drimmer] at no expense to him," and "placing the interests of Varitalk and the other represented parties ahead of [Drimmer]." As a result of Hankin's actions, Drimmer "was forced to retain independent counsel, at his own expense, to litigate and settle the claims against him in the Varitalk Action."

### B.     Hankin's Summary Judgment Motion

Hankin moved for summary judgment, claiming Drimmer's malpractice action was time-barred. Hankin conceded that the one-year statute of limitations applicable to attorney malpractice actions was tolled while he represented Drimmer, but urged that he ceased representing Drimmer at least a month before the district court granted his motion to withdraw on December 4, 2009. In support of his summary judgment motion, Hankin relied on the following facts:

3

• On October 21, 2009, after the automatic bankruptcy stay had been lifted and the infringement action returned to the active calendar, Drimmer sent an email to Hankin that said in relevant part: "I need to hire my own attorney — need to know what the deadlines are, etc."

• On October 22, 2009, Drimmer sent Hankin an email that said: "Yes, who is representing whom is important to discuss. As for me personally, I elect not to be represented by any of the current team, and I intend to hire my own attorney, perhaps in conjunction with Derek [Goldberg] and/or Fred [Lowe]."

• On October 29, 2009, Drimmer sent Hankin an email that said: "A Trustee has been appointed by the Bankruptcy Court. It is my understanding that the Trustee is now in charge of the litigation against Varitalk. I am sure that Bill Factor would put you in touch with the Trustee in order to address your concerns. As for me, I am in the process of looking for counsel to represent me as an individual."

• On November 4, 2009, Drimmer retained George Belfield "for the purpose of his getting into the case, analyzing, reviewing all the documents, trying to settle the case, et cetera." On November 24, 2009, Belfield attended a settlement meeting with Drimmer, plaintiff Baker, and Marc Smith (Baker's attorney), which Hankin did not attend. On November 30, 2009, Belfield billed Drimmer $52,592 in fees "for services rendered . . . in connection with the Baker matter for that month," and estimated that it would cost $339,390 to $415,290 to take the infringement action to trial. Belfield subsequently agreed to try the case for a flat fee of $200,000.

• On November 6, 2009, Hankin filed a motion to withdraw as counsel of record. After filing the motion, Hankin did no further substantive work on the infringement action.

C.      *Drimmer's Opposition to Summary Judgment*

Drimmer opposed the summary judgment motion, claiming the one-year limitations period was tolled until the court granted Hankin's motion to withdraw as trial

4

counsel on December 4, 2009. He contended that although he hired Belfield in November 2009 to evaluate the infringement action, he did not retain Belfield to represent him in that action until January 11, 2010. In support, he submitted his declaration stating that in November 2009 he asked Belfield, a long-time acquaintance, to review his file in the infringement action to "analyze the case as it stood up until that point and to recommend to me what I should do."[1] With Drimmer's permission, Belfield also spoke to Hankin and with Baker's counsel about matters including the possibility of settlement. However, there is no evidence that at any time prior to December 4, 2009, Belfield was the attorney of record for or appeared on behalf of Drimmer in the infringement action.

### D. Court's Order Granting Summary Judgment

The trial court granted Hankin's motion for summary judgment on December 7, 2012, concluding that Drimmer's causes of action for legal malpractice and breach of fiduciary duty were barred by the one-year statute of limitations. The trial court found that Hankin's representation of Drimmer ended as a matter of law when Drimmer retained Belfield in November 2009.

Drimmer appealed.

## DISCUSSION

### I. Appealability

Drimmer's January 3, 2013 notice of appeal purported to appeal from the trial court's December 7, 2012 order granting summary judgment. However, an order granting summary judgment is not an appealable order; the appeal is from the judgment. (*Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284, 288.)

---

[1]     The trial court sustained Hankin's objection to this statement in Drimmer's declaration. However, Drimmer said precisely the same thing at his deposition, the transcript of which Hankin included in support of his motion for summary judgment.

5

On December 31, 2013, Drimmer provided the court with a copy of a final judgment, entered December 30, 2013. We therefore exercise our discretion to treat the premature notice of appeal as a timely appeal from the judgment. (See *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 241, fn. 10; Cal. Rules of Court, rule 8.104(d).)

## II. Standard of Review

"'"A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts [supported by] the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true.' (*Jackson v. County of Los Angeles* [(1997)] 60 Cal.App.4th [171,] 178-179, citations omitted.)" (*Zamora v. Lehman* (2013) 214 Cal.App.4th 193, 204.)

## III. The Trial Court Erred in Concluding That Drimmer's Claims Were Time-Barred as a Matter of Law

### A. *The "Continuing Representation" Tolling Provision of Code of Civil Procedure Section 340.6*

Code of Civil Procedure section 340.6 sets forth the statute of limitations for legal malpractice. Subdivision (a)(2) states that "[a]n action against an attorney for a wrongful

6

act or omission . . . arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first. . . . [I]n no event shall the time for commencement of legal action exceed four years *except that the period shall be tolled during the time that . . . [t]he attorney continues to represent the plaintiff* regarding the specific subject matter in which the alleged wrongful act or omission occurred."[2]  (Italics added.)

Quoting the legislative history, the California Supreme Court in *Laird v. Blacker* (1992) 2 Cal.4th 606, 618, stated that the purposes of tolling based on continuous representation are "to 'avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error, and to prevent an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired.'"  The latter purpose "reflects the understanding that a client who relies on an attorney ordinarily is not able to evaluate the attorney's professional services and should be entitled to rely on the attorney's competence and good faith while the representation continues.  (*O'Neill* [*v. Tichy* (1993) 19 Cal.App.4th 114,] 120; see *Greene v. Greene* (1982) 56 N.Y.2d 86 [436 N.E.2d 496, 451 N.Y.S.2d 46, 50].)"  (*Gonzalez v. Kalu* (2006) 140 Cal.App.4th 21, 28, fn. omitted (*Gonzalez*).)

An attorney's representation of a client ordinarily ends when the client discharges the attorney or consents to a withdrawal, the court consents to the attorney's withdrawal, or the attorney completes the tasks for which the client retained him or her.  (See *Gonzalez*, *supra*, 140 Cal.App.4th at p. 28.)  In contested cases, however, courts have looked to a variety of factors to determine when an attorney's representation ends—and thus the statute of limitations commences to run—within the meaning of the statute.

---

[2]     Drimmer does not contend that he discovered Hankin's alleged professional negligence or sustained actual injury less than one year before he filed suit.

*B.*      *Triable Issues of Material Fact Exist as to Whether Drimmer Expressly*

              *Discontinued Hankin's Representation Before December 4, 2009*

Hankin asserts that Drimmer explicitly terminated him in late October 2009, when Drimmer advised Hankin by email that "I elect not to be represented by any of the current team, and I intend to hire my own attorney." By this time, Hankin says, "both sides had agreed that Hankin and HPL [(Hankin Patent Law)] were done representing Drimmer; in Drimmer's own words, by this same email correspondence, 'Mr. Hankin made it clear that he would not continue to represent any of the current Defendants and Cross-Complainants [and stated that] "unless and until I am paid for the work I have done thus far, and also given a deposit towards whatever future work is required, I am NOT going to represent any of the Defendants-Counterclaimants in this case."'" Thus, "[i]n applying the undisputed evidence to the 'objective' standard used for determining when 'continuing representation' terminates [citations], the only reasonable conclusion is that Hankin and HPL's representation had ceased more than a year before the Complaint was filed. The email correspondence wherein Drimmer 'elects' (present tense) not to be represented by Hankin or HPL—and Hankin 'made it clear that he would not continue to represent' Drimmer—demonstrate both Drimmer's decision to discharge Hankin and HPL, as well as a mutual agreement to terminate the representation." (Internal record references omitted.)

We do not agree that the record supports a finding that Drimmer terminated the attorney-client relationship with Hankin, as a matter of law, prior to December 4, 2009. Although some evidence may be susceptible of that inference, there is other evidence from which a trier of fact reasonably could conclude that the attorney-client relationship was not severed until the trial court granted the motion to withdraw on December 4, 2009. Among this evidence are the following:

*Hankin's declaration in support of his motion to withdraw.* Hankin filed a declaration in support of his motion to withdraw on November 6, 2009. Although that declaration detailed several reasons why Hankin should be permitted to withdraw as attorney of record in the infringement action—including conflicts of interest among

8

Hankin's clients and the clients' failure to pay Hankin's fees—it did *not* suggest that Drimmer had terminated Hankin. A fact finder reasonably could conclude that if Drimmer had already terminated Hankin, Hankin would have said so.

*Drimmer had not signed a substitution of counsel.* Hankin's declaration said that before filing his motion, he "met and conferred" with Drimmer and Drimmer's codefendants about his request to withdraw as counsel, but "despite making some progress, no other attorney has yet stepped in, through formal Substitution of Counsel, to relieve the undersigned and Hankin Patent Law, APC, of its obligation to defend the Defendants and to prosecute the Counterclaims on their behalf." A finder of fact reasonably could conclude that Drimmer's failure to sign the substitution of attorney form indicated that he had not yet decided how he intended to proceed.

*Discussions concerning Hankin's possible continued involvement in the infringement action.* Evidence produced in connection with the summary judgment motion suggests that even after Drimmer told Hankin on October 22, 2009, that he elected "not to be represented by any of the current team," Drimmer continued to discuss Hankin's possible continued involvement in the infringement litigation. Specifically, on November 30, 2009, Belfield stated in a letter to Drimmer that "[y]ou [Drimmer] have suggested that Marc Hankin stay on as trial counsel on the patent issues . . . . Let's discuss how you want to staff this case." A trier of fact reasonably could conclude that this letter suggests that even as late as November 30, 2009, Drimmer had not decided whether Hankin would continue to have a role in representing Drimmer in the infringement action.

Taken together, this evidence creates a triable issue as to whether Drimmer terminated Hankin before December 4, 2009. (See *Laclette v. Galindo* (2010) 184 Cal.App.4th 919, 928-929 [attorney-client relationship had not terminated as a matter of law because "this is not a case in which the client consented to termination or in which the trial court granted an application by counsel for withdrawal"; thus, "we cannot say as a matter of law that [client] could not reasonably expect [attorney] to represent her in the

9

event of issues arising concerning the performance of the settlement"].) The trial court erred in concluding otherwise.

        *C.      Triable Issues of Material Fact Exist as to Whether Drimmer Retained New Counsel to Replace Hankin in the Infringement Action Before December 4, 2009*

Hankin's motion for summary judgment asserted, and the trial court agreed, that Hankin's representation of Drimmer ended as a matter of law when Drimmer retained Belfield to represent him in November 2009. According to Hankin, by November 4, 2009, "the 'die was cast' when Belfield began working on the Underlying Action on Drimmer's behalf. . . . [¶] [T]he nature, volume, timing, and breadth of legal services provided by Drimmer's new attorney make it indisputable that Plaintiff had switched allegiances and was no longer represented by [Hankin] by November 2009."

Drimmer disagrees. While he concedes that he retained Belfield in early November 2009, he says that the scope of that initial representation was limited to "analyz[ing] the case as it stood up until that point and to recommend to me what I should do," not to replace Hankin as trial counsel. Drimmer contends he did not retain Belfield to represent him as trial counsel in the infringement action until January 11, 2010, after receiving Belfield's analysis and negotiating a fee for that purpose. We consider these issues below.

Hankin's summary judgment motion assumed that his representation of Drimmer necessarily terminated as a matter of law when Drimmer initially retained Belfield in early November 2009, but the case law does not support that conclusion. In *Nielsen v. Beck* (2007) 157 Cal.App.4th 1041 (*Nielsen*), clients retained new counsel, Beck, to assist with the bankruptcy of their business, and later to defend an unlawful detainer action. After a trial of the unlawful detainer action, a substantial judgment was awarded against the clients, and Beck attempted to help the clients settle the action and avoid enforcement proceedings. (*Id.* at pp. 1044-1045.) The clients became unhappy with Beck's representation and met with a new attorney, Zack. On August 26, 2004, the clients and

10

Beck executed a substitution of attorney form, which was filed with the court on September 3. Notwithstanding the substitution, on September 9, 14, and 18, the clients contacted Beck about tactics and procedures in resolving the unlawful detainer action, and on October 14, Beck billed the clients for "professional services rendered" on those dates. (*Id.* at pp. 1045-1046.) On September 2, 2005, the clients sued Beck for legal malpractice. (*Id.* at p. 1047.)

The trial court granted Beck's motion for summary judgment, concluding that Beck had ceased to represent the clients more than one year before they filed the legal malpractice action. (*Nielsen*, *supra*, 157 Cal.App.4th at p. 1047.) The Court of Appeal disagreed and reversed. It explained that a "strong argument can be made" that the statute of limitations began to run at least by August 26, 2004, when the substitution of attorney form was executed, because it demonstrated that the ongoing relationship between Beck and the clients had ended, and Beck would no longer be rendering legal advice. However, "there is contrary evidence from which a trier of fact could conclude that the relationship between Beck and the Nielsens had not been severed at the time the substitution of attorney form was signed, but rather, the statute was tolled through September 18, 2004. [¶] On September 9, 14, and 18, 2004, Robert Nielsen placed telephone calls to Beck asking for advice. There is evidence that during these three telephone calls, Beck rendered professional services. Beck's October 2004 billing statement requested payment for 'professional services rendered' and described the services Beck rendered as 'negotiations, options and strategy.' Beck testified in his deposition that during these telephone calls, Robert Nielsen asked for advice as to procedure, negotiations, and tactics to resolve the [unlawful detainer] case, and Beck was responsive to those requests. Thus, there is evidence from which a trier of fact could conclude that there was an ongoing mutual relationship and activities in furtherance of that relationship through September 18, 2004. If the trier of fact so concludes, then the statute of limitations would not have expired because the lawsuit was filed on September 2, 2005." (*Id.* at p. 1051.)

11

In so concluding, the court said that the proper inquiry in a continuing representation case is "whether, using an objective standard, there are triable issues of fact about whether there was an ongoing relationship and activities in furtherance of the relationship." (*Nielsen*, *supra*, 157 Cal.App.4th at p. 1050.) Further, because it found that consulting another attorney "'is not tantamount to ending a prior relationship,'" the court "'will not use that occurrence as a benchmark which, standing alone, signals the termination of the attorney and client's relationship.'" (*Id*. at p. 1049.)

The court reached a similar conclusion in *Worthington v. Rusconi* (1994) 29 Cal.App.4th 1488 (*Worthington*). There, the client retained Rusconi in May 1988 to probate her mother's estate. (*Id.* at p. 1492.) In early 1991, the client's siblings filed a petition to remove her as executrix; in response, the client sought new counsel, Allen. On April 5, 1991, Rusconi sent the client a letter in which he outlined his "'new thoughts'" about the probate action. (*Id.* at pp. 1492-1493.) On May 1, 1991, the client and Allen signed a substitution of attorney form, which Rusconi signed the following day. Eleven months later, on April 2, 1992, the client sued Rusconi for legal malpractice. (*Id.* at p. 1494.)

The trial court granted Rusconi's motion for summary judgment, concluding that the client's action was time-barred. (*Worthington*, *supra*, 29 Cal.App.4th at p. 1493.) The Court of Appeal reversed. It explained that the language of section 340.6 requires an "objective determination" of whether the representation has ended. Further, "'[o]rdinarily, an attorney's representation is not completed until the agreed tasks or events have occurred, the client consents to termination or a court grants an application by counsel for withdrawal.' (2 Mallen & Smith, Legal Malpractice [(3d ed. 1989)] Statutes of Limitations, § 18.12, p. 120.) 'The rule is that, for purposes of the statute of limitations, the attorney's representation is concluded when the parties so agree, and that result does not depend upon formal termination, such as withdrawing as counsel of record.' (*Id.* at p. 121; accord, *Shapero v. Fliegel* [(1987)] 191 Cal.App.3d [842,] 848 [the failure to formally withdraw as attorney of record, standing alone, will not toll the statute of limitations under the rubric of continued representation]; *Hensley v. Caietti*

[(1993)] 13 Cal.App.4th [1165,] 1173 ['[t]he period of tolling should not turn upon the fortuity of the time of delivery of notice of discharge to counsel . . .'].)

". . . In the instant case . . . the attorney-client relationship was not in obvious jeopardy. Although plaintiff admitted she had lost confidence and trust in her attorney by the time she first met with Mr. Allen, she did not manifest a desire to end Rusconi's representation of her at that point. . . . [¶] Continuity of representation ultimately depends, not on the client's subjective beliefs, but rather on evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship. Here plaintiff provided evidence of the ongoing nature of her attorney-client relationship with Rusconi—his April 5, 1991 letter advising her how to proceed on the probate action. Although not every contact between an attorney and his or her client will amount to representation [citation], the language Rusconi employed in his April 5th letter clearly manifested an ongoing mutual relationship and the giving of legal advice in furtherance of that relationship." (*Worthington*, *supra*, 29 Cal.App.4th at pp. 1497-1498, fns. omitted.) Thus, the court concluded, triable issues of material fact existed as to when Rusconi's representation ended, and summary judgment should not have been granted. (*Id.* at pp. 1498-1499.)

Taken together, these cases stand for the proposition that retaining new counsel— and even substituting new counsel in as counsel of record—is not determinative of when former counsel's representation ceases. Instead, a trier of fact must consider whether, using an objective standard, there was an ongoing relationship and activities in furtherance of that relationship. Retaining new counsel, although relevant, is not a benchmark that "'standing alone, signals the termination of the attorney and client's relationship.'" (*Nielsen v. Beck*, *supra*, 157 Cal.App.4th at p. 1049.)

Applying these principles to the present case, we conclude that there are triable issues of fact that preclude summary judgment. Although, like the clients in *Nielsen* and *Rusconi*, Drimmer hired new counsel more than one year before filing the present legal malpractice action, there are triable issues of fact as to what legal services Drimmer hired Belfield to perform and, specifically, whether Drimmer asked Belfield to replace Hankin

13

as trial counsel prior to December 4, 2009. Relevant to these issues are the following items of evidence:

*Belfield's November 30, 2009 letter.* In a November 30, 2009 letter to Drimmer, Belfield said Drimmer had asked him to prepare a "budget for the preparation and trial of this action" and set out a detailed estimate of the anticipated costs to take the case to trial. Nothing in the letter suggested that Drimmer had asked Belfield to try the case, or that Belfield had already begun to do so. The letter concluded: "[T]he more I learn about your lawsuit, the more I think I would enjoy trying, and hopefully winning, this case." Had Belfield already been retained to try the case, he presumably would have said that he "*will* enjoy" trying the case; his use of "would" instead of "will" suggests that his role in the litigation had not yet been defined.

*Drimmer had not yet executed a substitution of counsel.* Drimmer's contention about the limited scope of Belfield's initial representation also is supported by the fact that, as of December 4, 2009, Belfield had not substituted into the infringement action as counsel of record. His failure to do so appears not to have been an oversight; according to Hankin's declaration in support of his motion to withdraw as counsel, although Hankin "met and conferred" with Drimmer and his codefendants before filing the motion, "no other attorney has yet stepped in, through formal Substitution of Counsel, to relieve the undersigned and Hankin Patent Law, APC, of its obligation to defend the Defendants and to prosecute the Counterclaims on their behalf." This fact supports the inference that as of December 4, 2009, Drimmer had not yet decided whether to replace Hankin as trial counsel on the patent issues.

*December 31, 2009 letter from Belfield to Drimmer.* On December 31, 2009, Belfield sent Drimmer a letter regarding "Engagement as Counsel." As relevant here, the letter says: "Thank you for agreeing to engage us as your attorneys in the above action. . . . [¶] . . . [¶] . . . Our representation of each of the three of you (the 'Clients') relates . . . to your defense and counterclaims . . . in the above referenced action entitled Mark Baker, Eclipse, LLC v. Varitalk, Inc., Steve Drimmer, Fred Lowe, Anthony James, Derek Goldberg and Richard Davis (the 'Subject Action).'" It continues: "At your

14

request, we have agreed to represent the three of you at the trial of this action for a non-refundable flat fee of $200,000 . . . if the trial lasts up to five court days, and $225,000 if the trial lasts more than five court days.  The $200,000 flat fee must be paid in full before we begin our representation including making any appearance as your counsel of record, e.g., by filing any papers or making any appearances in court.  As you know, there is a Trial Setting Conference set for January 11, 2010, and if we are to appear for you as your counsel on that day, the $200,000 fee must be paid in full before that appearance."  Taken as a whole, this letter—and particularly the statement that Belfield and his firm required payment "*before* we begin our representation" (italics added)—supports an inference that as of the date of the letter, Belfield had not yet begun representing Drimmer in the infringement action.

The evidence cited above demonstrates that, as in *Nielsen* and *Worthington*, there are triable issues of fact in the present case as to when Drimmer terminated his relationship with Hankin—and, specifically, whether Drimmer's retaining of Belfield "manifest[ed] a desire to end [Hankin's] representation."  (*Worthington*, *supra*, 29 Cal.App.4th at pp. 1498-1499.)  The trial court erred in concluding otherwise.[3]

> D. *The Present Case Is Distinguishable From* Hensley v. Caietti

Both in his motion for summary judgment and on appeal, Hankin relied extensively on *Hensley v. Caietti*, *supra*, 13 Cal.App.4th 1165 (*Hensley*), for the proposition that "the undisputed facts lead to only one conclusion:  that Hankin and HPL's representation of Drimmer in the [infringement action] terminated more than a

---

[3]   The trial court considered it dispositive that Belfield, not Hankin, accompanied Drimmer to a November 24 meeting with Baker and his counsel during which settlement was discussed.  We do not agree.  It is not uncommon to have counsel other than trial counsel negotiate settlement.  In any event, while Belfield's participation in settlement discussions may be a fact relevant to whether Hankin remained Drimmer's counsel, it is not the *only* relevant fact.  Because triable issues of fact remain, summary judgment should not have been granted.

15

year before his Complaint was filed."  For the following reasons, we disagree with Hankin.

In *Hensley*, an attorney, Caietti, represented Hensley in a marital dissolution action.  Hensley and her husband reached a settlement on spousal support and property division, and the court directed the husband's counsel to prepare the judgment.  On November 3, 1989, Hensley met with Caietti, told him she had not been fully aware of all the terms of the settlement, and refused to sign the proposed judgment, prompting a "terrible argument."  Caietti yelled at Hensley to get out of his office, and she "considered their attorney-client relationship terminated at this point."  (*Hensley*, *supra*, 13 Cal.App.4th at p. 1168.)  Three days later, on November 6, Hensley asked a new attorney, Parker, to replace Caietti, and Parker said she could not do so unless Caietti executed and filed a substitution of attorney form.  Hensley executed the form on November 13; Caietti received it on November 16 and signed it November 20, 1989.  (*Id.* at pp. 1168-1169.)  Hensley sued Caietti for legal malpractice on November 15, 1990.  (*Id.* at p. 1169.)

Caietti moved for summary judgment, contending that Hensley's action was time-barred.  The trial court granted the motion, and the Court of Appeal affirmed.  It explained:  "Hensley contends the trial court erred in failing to toll the limitations period under this provision.  She argues that Caietti continued to represent her until November 16, 1989, when he received notification of his discharge from her new attorney, Parker, a date within one year of the filing of the malpractice action.  Caietti argues for an earlier date outside the one-year limitations period, fixed by the point at which 'the attorney-client relationship disintegrates to the extent that there is no continuity of professional services from which the alleged malpractice stems . . . .'  . . . [¶]  . . . [¶]

"Hensley did state that in her view the attorney-client relationship was over at the point of her acrimonious departure from Caietti's office.  However, bare opinions are variable in firmness and susceptible to reconsideration.  We need not decide whether such an opinion ends the period of representation until that opinion is acted upon.  Hensley's

16

opinion was acted upon more than a year before she filed this action. She asked Parker to serve as replacement counsel on November 6, 1989. At this point the die was cast and the tolling afforded under Code of Civil Procedure section 340.6, subdivision (a)(2) ended. [Citation.]

"The client has an absolute right to discharge counsel. [Citations.] Having discovered the alleged negligent act and unmistakably acted to end the attorney-client relationship, Hensley has no equitable claim for a limitations period longer than that afforded a person who discovers negligence after the discharge or withdrawal of counsel. The period of tolling should not turn upon the fortuity of the time of delivery of notice of discharge to counsel, a matter entirely within Hensley's control. [Citation.]" (*Hensley*, *supra*, 13 Cal.App.4th at pp. 1169-1173.)

*Hensley* is distinguishable from the present case. As an initial matter, we note that the conflict between Drimmer and Hankin was far less explosive—and far more ambiguous—than the conflict between Hensley and her attorney. According to the *Hensley* opinion, Hensley and her attorney had a "terrible argument" that ended with counsel ordering Hensley out of his office, and she "considered their attorney-client relationship terminated at this point." In the present case, in contrast, notwithstanding Drimmer's statement that "I elect not to be represented by any of the current team," Drimmer subsequently suggested to Belfield that Hankin "stay on as trial counsel on the patent issues." By any measure, the scene between Hensley and her attorney was unmatched in this case—and, in any event, that scene was judged by the *Hensley* court insufficient to terminate the attorney-client relationship because "bare opinions are variable in firmness and susceptible to reconsideration." (*Hensley*, *supra*, 13 Cal.App.4th at p. 1172.)

Further, and most significantly for our purposes, in *Hensley* there was no factual dispute as to the purpose for which Hensley retained Parker. The *Hensley* parties apparently agreed that on November 6, 1989, Hensley asked Parker to serve as "*replacement* counsel" (*Hensley*, *supra*, 13 Cal.App.4th at p. 1172, italics added); several days later, Hensley executed a substitution of attorney form (*id*. at p. 1169). In the

17

present case, in contrast, there is a factual dispute as to the scope of Belfield's representation of Drimmer in November 2009: Hankin urges that even as early as November 2009, Drimmer hired Belfield to replace him, while Drimmer points to evidence suggesting that he initially retained Belfield only to evaluate the case and advise him how to proceed. Further, as of November, Drimmer had not executed a substitution of attorney form. In light of the factual disputes between the parties as to (1) the scope of Belfield's role in November 2009, and (2) when Drimmer decided to hire Belfield to try the infringement action, we cannot conclude as a matter of law that Drimmer had replaced Hankin at any time prior to December 4, 2009.

## IV. There Is No Other Basis on Which to Affirm the Trial Court's Grant of Summary Judgment

Hankin contends that even if we do not conclude that Drimmer's action is time-barred as a matter of law, we may affirm the grant of summary judgment on one of two alternative grounds. We do not agree.

*First*, Hankin contends that because all Drimmer's claims are premised on purported conflicts of interests between Drimmer and his codefendants, they fail as a matter of law because Drimmer executed a comprehensive conflicts waiver on January 5, 2009. We need not consider the scope of Drimmer's conflicts waiver because Hankin's underlying assertion is wrong: Drimmer's claims are *not* all premised on purported conflicts of interest. In addition to conflicts of interest, Drimmer alleges that Hankin failed "to adequately defend and represent [Drimmer] in the Varitalk Action," "to pursue [Drimmer's] claims against prior patent counsel," "to advise [Drimmer] that rejection of reasonable settlement demands made to the Varitalk Parties in the Varitalk Action could expose [Drimmer] to substantial liability," and "to advise [Drimmer] that such settlement would have resolved the claims against [Drimmer] at no expense to him." Hankin makes no showing why any of these claims fail because Drimmer executed a conflicts waiver.

*Second*, Hankin contends that Drimmer cannot prove damages, an essential element of his claims. In support, he notes that Drimmer settled the underlying

18

infringement action for less than he had agreed to pay Belfield to try the case, and he thus suggests that Drimmer "can never show that he would have obtained a 'better result' in the Underlying Action." But Hankin's contention assumes that Drimmer's only two possible options were (1) settling the infringement action for $150,000, or (2) incurring legal fees of $200,000 to try the case. Drimmer's second amended complaint suggests otherwise, asserting that because of Hankin's negligence, "the Varitalk Action did not settle, Varitalk filed [for] bankruptcy and [Drimmer] was forced to retain independent counsel, at his own expense, to litigate and settle the claims against him in the Varitalk Action." Hankin has not shown that this theory of damages is without merit, and thus he cannot prevail on summary judgment on this basis.

### DISPOSITION

Because Hankin failed to show that there is no triable issue as to any material fact and he is entitled to judgment as a matter of law, the trial court erred in granting summary judgment. We therefore reverse the judgment and order granting summary judgment. Drimmer shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

WILLHITE, Acting P. J.          MANELLA, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19