*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| HOLLY SHELDON-LEE, | ) | |
| | ) | Supreme Court No. S-18214 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-20-01219 CI |
| v. | ) | |
| | ) | O P I N I O N |
| BIRCH HORTON BITTNER, INC., an | ) | |
| Alaska Professional Corporation, | ) | No. 7757 – March 21, 2025 |
| DAVID K. GROSS, and MARA E. | ) | |
| MICHALETZ, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Holly Sheldon-Lee, pro se, Talkeetna, Appellant. Chester D. Gilmore and Lauren Sherman, Cashion Gilmore & Lindemuth, Anchorage, for Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

BORGHESAN, Justice.

## I. INTRODUCTION

A woman sued her former attorneys for malpractice. She alleged that they failed to advocate for her interests in mediation, and as a result she and her business entered into an unfavorable settlement. The superior court granted summary judgment

to the attorneys, concluding that the woman's lawsuit was barred by the statute of limitations. It also denied her motion to amend her complaint.

We reverse the grant of summary judgment. The limitations period for a legal malpractice claim expires three years after the cause of action accrues. The woman filed her malpractice suit more than three years after her injury occurred. But under the continuous representation rule, a legal malpractice claim does not accrue while the defendant attorney continues to represent the plaintiff in the matter in which the malpractice is alleged. Because there is a genuine factual dispute about when the attorneys' representation in the matter ceased, we vacate the superior court's decision and remand for further proceedings.

We affirm the superior court's ruling that the attorneys are not barred by the doctrine of fraudulent estoppel from pleading the statute of limitations defense. The woman argued that her attorneys concealed information about conflicts of interest involving the opposing party to the mediation. But because the woman failed to present evidence that her delay in filing suit was in reasonable reliance on the nondisclosure, her estoppel defense fails as a matter of law.

Finally, we vacate and remand the superior court's decision to deny leave to amend the complaint to assert claims of disgorgement of attorney's fees based on the alleged conflicts of interest. Because the claims were not futile, leave to amend should have been granted.

## II. FACTS AND PROCEEDINGS

### A. Origins Of The Dispute

Holly Sheldon-Lee and Robert Sheldon are children of famed glacier pilot Donald Sheldon and his wife Roberta Sheldon.[1] Donald and Roberta built a cabin — known as the Mountain House — on a rock outcropping overlooking the Ruth Glacier,

---

[1] *Lee v. Sheldon*, 427 P.3d 745, 747 (Alaska 2018).

in the shadow of Denali.[2]  Roberta survived Donald, and years later she created a trust that would control her assets upon her death.[3]  Among the assets Roberta transferred to the trust was her interest in Mountain House, LLC (MHLLC), which owned the Mountain House.[4]  She named Robert Sheldon as successor trustee and made her three children (Robert, Kate Sheldon, and Holly) beneficiaries.[5]

Following Roberta's death, disagreements arose between Holly and Robert.[6]  In 2014 Holly hired the law firm Birch Horton Bittner & Cherot, Inc. (BHBC)[7] to represent her and her company, Sheldon Air Service LLC (SAS), in a suit against Robert (the "trust case").  Holly and her husband are the sole owners and operators of SAS.

Holly worked with two attorneys from BHBC — David Gross and Mara Michaletz.  When Holly first retained BHBC, Robert sent the firm a letter informing them that he believed there was a conflict of interest between him and another BHBC attorney.  Robert's letter did not identify any specific conflicts.  Gross responded to Robert and explained that the only potential conflict he knew of related to an informal conversation between Robert's wife and a BHBC attorney regarding her job.  But Gross stated he did not believe that the relationship qualified as a conflict under the Rules of Professional Conduct.

---

[2]  *Id.*

[3]  *Id.*

[4]  *Id.*

[5]  *Id.*

[6]  *Id.*

[7]  The law firm in this case is commonly known as "Birch Horton Bittner & Cherot" and refers to itself in briefing as BHBC, so that is the name we use here.  But the name used in Holly's complaint is "Birch Horton Bittner, Inc.," so that is the name we use in the caption.

In the trust case, both Holly and Robert filed summary judgment motions, and the superior court granted partial summary judgment in favor of Robert.[8] In the wake of the superior court decision, the parties scheduled a mediation to resolve outstanding issues.

## B. Mediation

The mediation is the basis for Holly's subsequent malpractice claim against BHBC. The mediation occurred in December 2015. The parties hired retired judge Eric Sanders to serve as the mediator. After several hours of mediation, Holly signed an agreement drawn up by Sanders. The document stated that the parties had "reached an agreement to the settlement of all claims of all parties" and that they would "execute a Settlement Agreement and Mutual Release of All Claims . . . as a result of the full and complete settlement reached today." Later that day Holly texted her attorneys to thank them and to say she felt "very sick to [her] stomach" about some of the terms of the agreement.

## C. Other Counsel Retained

About two weeks after the mediation, Holly emailed Gross and Michaletz to let them know that she felt "unsettled" about the agreement that had been reached and wanted to get a second opinion. She identified another firm she wanted to consult with and asked the BHBC attorneys if they would help to bring the other firm up to speed.

A couple weeks later, Holly and her husband had a call with Gross and Chris Brecht, an attorney from a different firm. In an email from Gross memorializing the call, Gross discussed a suggestion that Holly could get out of the settlement agreement by claiming it was made under duress. Gross shared that he did not believe Holly's situation at the mediation amounted to duress because, although "the day was

---

[8]     *Lee*, 427 P.3d at 747-48.

an emotional one," she was free to walk away at any point.  He also advised Holly that he believed the agreement was "valid and enforceable."

At some point after the call, Gross emailed Brecht and stated that he believed "the time ha[d] come for [Brecht] to substitute in as counsel and take the lead (and the responsibility) for future litigation decisions."  He then asked Brecht to prepare the appropriate documentation.  In February 2016 Holly consented to BHBC's withdrawal as her attorney.  A motion for substitution of counsel, signed by Holly, was filed with the court, documenting BHBC's consensual withdrawal and substituting Brecht's firm as Holly's new counsel.  The superior court granted the motion in March 2016.  BHBC remained the counsel of record for SAS in the trust litigation.

### D.    Judgment And Appeal

Through Brecht, Holly filed a motion in the superior court in which she argued the settlement reached in meditation was not binding on her and SAS.  But in June 2016 the superior court concluded that the agreement was binding.  Consequently the court entered judgment against both Holly and SAS.  In August 2016 Gross recommended resolving the remaining issues in the trust case before the mediator, Judge Sanders, rather than filing an appeal.  In October 2016 Gross asked Holly whether she would like his "continued assistance" regarding her appeal, but remarked that she was in "good hands" with Brecht.

Holly appealed.[9]  In November 2016 Gross filed a "Notice of Non-Representation," explaining that BHBC did not represent SAS in Holly's appeal.  Gross followed up in a letter to Holly and her husband.  Gross explained that although he was "technically" still the attorney of record for SAS in the superior court, his continued participation was "unnecessary" because Brecht had "taken the lead."  Gross stated he would therefore be "closing [his] file."

---

**9**      *Id.* at 749.

### E.     Continued Communication Between BHBC And Holly

After the March 2016 substitution, Gross continued to exchange emails with Holly and her husband through February 2019. In August and October 2016 Gross sent Holly a handful of emails about Holly's then-ongoing trust litigation. In January of 2017 Gross wrote Holly in regard to the superior court's entry of an order awarding attorney's fees and costs against Holly and SAS in connection with the unsuccessful bid to avoid the settlement in the trust litigation. Gross stated: "I am assuming that [Brecht] has spoken to you about the recent order regarding costs and fees. If you have any questions for me, as the attorney for SAS, please feel free to give me a call." Finally, on February 5, 2017, when Judge Sanders invited "counsel for Holly" to respond to a filing in the trust litigation, Gross remarked: "Because [Brecht] took the lead in the post-mediation case, I would suggest that he is in the best position to respond to Judge Sanders's request. You also don't want to incur the expense of having two lawyers working on this matter."

Gross and Holly continued to occasionally exchange emails during the first half of 2017. These emails discussed a potential contract case by Holly's company, SAS, against MHLLC based on alleged promises by Roberta and Robert that MHLLC would continue to use SAS as its air service provider. The emails also addressed a fee dispute in the trust litigation.

In April 2017 Gross responded to questions from Holly. Gross summarized the proceedings in the trust case, commented that SAS "still has a claim against the Mountain House LLC for breach of contract," and then advised: "At this point, I am not sure I am the best person to represent you going forward. If you want to pursue a claim against Mountain House LLC, you should move quickly by securing a new lawyer before the Statute of Limitations runs."

In another email, sent a few days later, Holly requested that Gross file the initial complaint in the contract case. Gross responded two days later in a long email in which he explained why he believed her contract claim was unlikely to succeed and

advised that he would not litigate the case. Gross's response warned Holly that if SAS's contract claim against MHLLC was successful, her one-third interest in MHLLC, which she had gained through the trust settlement, would suffer a loss.

In June 2017 Gross sent three emails addressed to Holly and her husband. In the first email Gross explained that Robert had filed a motion to amend the judgment in the trust case and recommended opposing it. Gross concluded by saying: "[Brecht] had been doing this work, so I'm assuming that [Brecht] will step in and do this work. If not, please let me know." In the second email, sent seven days later, Gross reminded Holly that her opposition to the motion was due soon. In a third email sent three days later Gross then explained: "I have taken no steps to oppose the motion, as you have another lawyer who is responsible for doing so."

In 2018 we affirmed the superior court's order holding that Holly and SAS were bound by the settlement agreement reached in mediation.[10]

## F.    Proceedings In This Case

On February 11, 2020, Holly filed a complaint against BHBC, Gross, and Michaletz for legal malpractice. She asserted that they committed malpractice because they did not have her sign a fee agreement, failed to make sure she understood the mediation proposal, and did not protect her from "pressure, bullying and coercion" during the mediation.

Around a month later BHBC moved for summary judgment, arguing that Holly's suit was barred by the statute of limitations. It argued that her claim began to accrue on one of three dates: (1) December 1, 2015, the date of mediation; (2) December 29, 2015, when Brecht officially replaced BHBC as Holly's counsel; or (3) August 3, 2016, when the superior court denied Holly's motion for reconsideration.

---

[10]    *See id.* at 750-52.

Accordingly, BHBC argued that the three-year limitations period for malpractice claims[11] had expired by the time Holly filed her suit in February 2020.

Holly opposed the motion, arguing that under the continuous representation rule[12] her claim was still timely. She also argued that BHBC should be estopped from raising a statute of limitations defense because it had concealed its conflicts of interest from her. She alleged that BHBC had a conflict of interest because (1) it had represented SAS's main competitor, K2 Aviation, and (2) another BHBC attorney had represented multiple companies Robert had helped start.[13]

During the course of litigation, BHBC filed three more motions for summary judgment, each with a different theory for why Holly's claims were unavailing. Holly filed oppositions to the second and fourth motions for summary judgment, along with exhibits and affidavits. She also moved to amend her complaint to include her conflict-of-interest allegations. Her amended complaint included a new theory of relief — she sought a refund of fees from BHBC as a result of their conflicts of interest. She maintained that she did not learn of either of BHBC's alleged conflicts until after the start of 2018.

---

[11] AS 09.10.053.

[12] *See Wettanen v. Cowper*, 749 P.2d 362, 365 (Alaska 1988) (describing continuous representation rule without deciding whether to adopt it); *id.* ("[W]hen the injury to the client may have occurred during the period the attorney was retained, the malpractice cause of action does not accrue until the attorney's representation concerning the particular matter in issue is terminated." (quoting *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C. App. 1978))).

[13] At a few points during litigation, BHBC suggested Holly may have been concerned with a potential conflict of interest due to the fact that one of the BHBC attorneys went to the same church as Robert Sheldon's family and had done work for a school where Robert's wife worked. But Holly clarified in her affidavits that the conflicts of interest she asserts have nothing to do with the school, church, or Robert's wife.

The superior court prioritized the first motion for summary judgment at BHBC's request. The court heard oral argument and eventually granted summary judgment for BHBC. It reasoned that Holly was on inquiry notice of her claims by, at the latest, August 3, 2016 — the date she was served with the order denying her motion for reconsideration in the trust case — and therefore that the statute of limitations had run by the time she filed her malpractice suit in February 2020. And the court rejected Holly's arguments for tolling the limitations period. It concluded that even if the continuous representation rule applied, it would not save Holly's claim because her communications with BHBC pertained to "SAS's potential contract claim against MHLLC" and did not show continued representation of Holly in her personal capacity. The court also rejected Holly's equitable estoppel theory, reasoning that neither of Holly's alleged conflicts raised concerns under the Rules of Professional Conduct. The court summarily denied Holly leave to file an amended complaint because it deemed her new claims futile. Holly filed a motion for reconsideration, which the superior court denied.

Holly appeals.

## III. STANDARD OF REVIEW

We review summary judgment decisions de novo, "affirming the decision if there are no genuine issues of material fact bearing on the legal questions presented and if the answers to those legal questions require a decision in favor of the moving party."[14] All factual inferences are drawn in favor of the nonmoving party.[15]

"[O]urs is a 'lenient standard for withstanding summary judgment.' "[16] This "low standard . . . serves the important function of preserving the right to have

---

[14]     *Makarka v. Great Am. Ins. Co.*, 14 P.3d 964, 966 (Alaska 2000).

[15]     *Morgan v. Fortis Benefits Ins. Co.*, 107 P.3d 267, 269 (Alaska 2005).

[16]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014) (quoting *Shaffer v. Bellows*, 260 P.3d 1064, 1069 (Alaska 2011)).

factual questions resolved by a trier of fact only after following the procedures of a trial."[17] Our standard is "more protective of this right than the federal standard."[18]

Whether a claim is time-barred by the statute of limitations is question of law reviewed de novo.[19] But "[t]he date on which a statute of limitations begins to run is a question of fact we review for clear error."[20] Summary judgment "ordinarily should not be used to resolve when a statute of limitations commences" because the question is fact-dependent.[21]

We will reverse a superior court's decision to deny a motion for reconsideration "only in the event there has been an abuse of discretion."[22] The denial of a motion to amend a complaint is also reviewed for abuse of discretion.[23]

## IV. DISCUSSION

### A. It Was Error To Grant Summary Judgment To BHBC Based On The Statute Of Limitations.

Holly argues that her claim was timely filed. But if it was not, Holly argues that the limitations period should be tolled under the continuous representation rule, which we have acknowledged but never adopted. Alternatively, Holly argues that BHBC should be estopped from pleading the statute of limitations defense because it fraudulently concealed its conflicts of interest from her. We address each point in turn.

---

[17] *Id.* at 521.

[18] *Id.*

[19] *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 140 (Alaska 2004).

[20] *Weimer v. Cont'l Car & Truck, LLC*, 237 P.3d 610, 613 (Alaska 2010).

[21] *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1031 (Alaska 2002).

[22] *Brown v. State*, 563 P.2d 275, 279 (Alaska 1977).

[23] *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 283 (Alaska 2004).

## 1. The superior court did not err in applying the discovery rule.

Holly first argues that her lawsuit is timely. "[A]ctions for a breach of fiduciary duty arising out of a professional services relationship generally are governed by AS 09.10.053," which provides for a three-year statute of limitation.[24]

The date on which this statute of limitations begins to run is governed by the "discovery rule."[25] "Where an element of a cause of action is not immediately apparent, the discovery rule provides the test for determining the date on which the statute of limitations begins to run."[26] Under this rule, the statute of limitations does not begin to run until "the date when the claimant reasonably should have known of the facts supporting her cause of action" or "the date when a reasonable person [would have] enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights."[27]

To succeed in a legal malpractice cause of action, the plaintiff must prove four elements: duty, breach, causation, and damages.[28] Regarding the "damages" element, the limitations period "begins running when a party suffers actual damages, without regard to whether the full extent of the damages is known at the time."[29] Accordingly, we have "reject[ed] the 'exhaustion of appeals' rule," under which a malpractice claim cannot accrue until the appeal of any adverse ruling is concluded.[30]

---

[24] *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1272-73 (Alaska 2013).

[25] *John's Heating Serv.*, 46 P.3d at 1031-32.

[26] *Id.* at 1031 (footnote omitted).

[27] *Id.* (quoting *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 291 (Alaska 1988)); *see also Arnoult v. Webster*, 480 P.3d 592, 597 (Alaska 2020).

[28] *Jones v. Westbrook*, 379 P.3d 963, 967 (Alaska 2016).

[29] *Beesley v. Van Doren*, 873 P.2d 1280, 1282 (Alaska 1994).

[30] *Id.* (citing *Wettanen v. Cowper*, 749 P.2d 362, 365 (Alaska 1988)).

In other words, an adverse trial court ruling can put the client on notice that she has been injured, even if the ruling could later be reversed on appeal.

The superior court ruled that Holly had notice of BHBC's alleged negligence on the date she "consulted with Brecht in an effort to invalidate the settlement agreement": December 29, 2015. Alternatively, it noted that Holly did not dispute that she was aware of her injury by the date on which the court denied her motion for reconsideration of its order enforcing the settlement agreement: August 3, 2016. Since these dates were more than three years before Holly filed suit, the court concluded that her lawsuit was barred by the statute of limitations, unless the limitations period was tolled.

Holly contends that there is a genuine issue of material fact as to when she discovered the facts underlying her malpractice claim. She first argues that she did not discover the elements of her cause of action until she met with a malpractice attorney in October of 2018, almost three years after the mediation. She next argues that she did not discover the facts underlying her conflict-of-interest allegations until she conducted her own investigation after the end of her representation by BHBC. As support, she points to affidavits in which she asserts that she was either unaware of or not legally sophisticated enough to appreciate BHBC's conflicts of interest during the trust litigation. Under either theory, she argues that her claim accrued sometime after the start of 2018, making her 2020 complaint timely.

Drawing all factual inferences in favor of Holly, we agree with the superior court's conclusion that she had sufficient information to alert her to the existence of a malpractice claim. The key question is when Holly learned sufficient information to put her on inquiry notice that she had been injured by BHBC's

negligence.[31] Holly's claim for damages is based upon the fact that she entered into a settlement agreement that was disadvantageous to her. She claims that she signed this disadvantageous agreement because her attorneys allowed her to be "pressured, bullied and coerced over a period of many hours" and gave her inadequate guidance.

But Holly had enough information to alert her that she should begin an inquiry to protect her rights on the date she felt "pressured, bullied and coerced" at the mediation — December 2015. In fact, Holly did begin an inquiry to protect her rights shortly after when she sought a new attorney for a second opinion. She had sufficient information to be aware that she had suffered injury as a result of her attorney's conduct on December 29, 2015, the approximate date when she paid Brecht to review BHBC's work. And she certainly was aware she had been injured by BHBC's alleged negligence on August 3, 2016, when she received the superior court's order declining to reconsider its ruling that she was bound by the terms of a settlement that she believed was contrary to her interests. Each of these dates was more than three years before she filed her malpractice suit.

Holly's argument that she did not discover BHBC's malpractice until 2018 is similar to the argument we rejected in *Preblich v. Zorea*.[32] In that case we held that a plaintiff had notice of her potential cause of action after she had consulted a second attorney regarding how the defendant's neglectful representation caused her to suffer significant harmful consequences in bankruptcy.[33] Under Holly's own version of events, she was "pressured, bullied and coerced" into signing an agreement she did not understand, and then she consulted a second attorney regarding whether she had

---

**31**    *See Arnoult*, 480 P.3d at 597 (explaining that "inquiry notice date" refers to "the date when the plaintiff has information which is sufficient to alert a reasonable person to begin an inquiry to protect his rights" (quoting *John's Heating Serv.*, 46 P.3d at 1031)).

**32**    996 P.2d 730, 735-36 (Alaska 2000).

**33**    *Id.* at 735.

signed the agreement under duress. In both cases the plaintiffs learned they had suffered harm and then consulted a second attorney regarding their options. For Holly, that point in time was in December 2015.

Holly argues that her claim did not accrue until she spoke to a malpractice attorney in 2018. But the discovery rule delays the start of the limitations period only until the plaintiff learns of "information sufficient to alert a reasonable person to the fact that he has a potential cause of action."[34] A plaintiff's ignorance of the law does not toll the statute of limitations; holding otherwise would allow plaintiffs to sue based upon stale facts so long as they only recently consulted an attorney.

The fact that Holly did not learn of BHBC's alleged conflicts of interest until later does not change the outcome. The thrust of Holly's conflict-of-interest argument is that BHBC's attorneys induced her to adopt a settlement agreement against her best interests in order to preserve their firm's lucrative relationship with her brother. But regardless of what motivated Gross and Michaletz, Holly knew of their allegedly unsatisfactory representation at the time of the mediation.[35] She was aware (according to her own account) that she had been "pressured, bullied and coerced" into settling and that her attorneys did nothing to intervene. She incurred damages, at the latest, when the superior court ruled that she was bound by the settlement agreement. In other words, the attorneys' allegedly conflicted motivations did not cause Holly's harm. It was their alleged conduct — allowing her to be bullied and coerced into accepting a settlement — that caused the harm she asserts. Even when all factual inferences are drawn in favor of Holly, she was aware of her attorney's alleged negligence in late 2015, and aware

---

[34] *Id.* at 734 (quoting *Pedersen v. Zielski*, 822 P.2d 903, 908 (Alaska 1991)).

[35] Whether BHBC's alleged failure to disclose these asserted conflicts tolls the statute of limitations is a different question, which we address in the context of Holly's equitable estoppel argument. *See* discussion *infra* Section IV.A.3.

that she had been injured by August 2016, when the court denied reconsideration of its decision that she was bound by the settlement.

**2. The continuous representation rule applies, and there is a genuine factual dispute about how long it delayed accrual of Holly's malpractice claim.**

Holly next argues that regardless of when she discovered the elements of her malpractice claim, her claim was timely under the continuous representation rule. We have never adopted this rule, but have twice suggested that it has merit.[36] Under this rule, "when the injury to the client may have occurred during the period the attorney was retained, the malpractice cause of action does not accrue until the attorney's representation concerning the particular matter in issue is terminated."[37] If the rule applies, Holly argues, her malpractice claim is timely because BHBC's attorneys represented her even after a substitution of counsel was filed in 2016 and well into 2017, less than three years before she filed suit on February 11, 2020.

**a. We adopt the continuous representation rule to determine when a legal malpractice claim accrues.**

In jurisdictions where it has been adopted, the continuous representation rule tolls statutes of limitations applicable to malpractice claims until the end of the attorney's representation in the matter in which the alleged malpractice occurred.[38] In *Wettanen v. Cowper* we observed that the continuous representation rule has "much to

---

[36] *See Wettanen v. Cowper*, 749 P.2d 362, 365 (Alaska 1988); *Beesley v. Van Doren*, 873 P.2d 1280, 1283 n.4 (Alaska 1994).

[37] *Wettanen*, 749 P.2d at 365 (quoting *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C. 1978)).

[38] *See, e.g., Janicki Logging & Constr. Co. v. Schwabe, Williamson & Wyatt, P.C.*, 37 P.3d 309, 313 (Wash. App. 2001); *Muller v. Sturman*, 437 N.Y.S.2d 205, 207-08 (N.Y. App. Div. 1981); *see also* Cal. Civ. Proc. Code § 340.6(a)(2) (providing that statutes of limitations are tolled while "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred").

recommend it."[39]  In *Beesley v. Van Doren* we observed that adopting the continuous representation rule would "resolve the concern for the attorney-client relationship" served by the exhaustion of appeals rule, which we do not apply.[40]  But in both cases we concluded that tolling until the end of the representation would not have rendered the lawsuit timely.[41]  Here, however, the continuous representation rule would make Holly's claims timely if she could prove that BHBC's representation ended less than three years prior to filing her complaint.  Therefore the issue is squarely presented for our review.

We now hold that the continuous representation rule applies in Alaska to determine when a legal malpractice claim accrues.  In our view the arguments for the rule are more compelling than the arguments against it.

One of the most commonly cited rationales for the rule is respect for an ongoing attorney-client relationship.[42]  A professional relationship requires "trust and

---

[39]     749 P.2d at 365.

[40]     873 P.2d at 1283 n.4.  The "exhaustion of appeals" rule generally holds that "the injury or damaging effect on the unsuccessful party is not ascertainable until the appellate process is completed or is waived by a failure to appeal."  *Id.* at 1282 (quoting *Amfac Distrib. Corp. v. Miller*, 673 P.2d 792, 794 (Ariz. 1983)).  We rejected this rule in *Beesley.  Id.*

[41]     *See id.* at 1281, 1283 n.4; *Wettanen*, 749 P.2d at 365.

[42]     *See, e.g.*, *Laird v. Blacker*, 828 P.2d 691, 698 (Cal. 1992); *Shumsky v. Eisenstein*, 750 N.E.2d 67, 70 (N.Y. 2001); *Smith v. Stacy*, 482 S.E.2d 115, 120-21 (W. Va. 1996); *Janicki Logging & Constr. Co.*, 37 P.3d at 314.

confidence."[43] When clients sue their attorneys, this trust and confidence is damaged.[44] The continuous representation rule seeks to avoid placing clients in a dilemma: whether to preserve an effective attorney-client relationship in the ongoing legal matter or to seek damages from their attorneys for malpractice.[45]

A second and related rationale for the rule is encouraging the client to give the attorney a chance to correct or minimize errors during the course of the representation.[46] "The purpose of the rule is to give attorneys an opportunity to remedy their errors, establish that there was no error, or attempt to mitigate the damage caused by their errors, while still allowing the aggrieved client the right to later bring a malpractice action."[47] Allowing attorneys to correct their mistakes can negate the need for a subsequent malpractice suit. This in turn reduces speculative litigation by clients who do not want to give up their malpractice claims but whose damages might be

---

[43]    *Muller*, 437 N.Y.S.2d at 208 ("[T]he application of the continuous representation doctrine in attorney malpractice envisions a relationship between the parties that is marked with trust and confidence."); *Shumsky*, 750 N.E.2d at 70 ("The continuous representation doctrine, like the continuous treatment rule, its counterpart with respect to medical malpractice claims, 'recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith . . . .' " (quoting *Greene v. Greene*, 436 N.E.2d 496, 500 (N.Y. 1982))).

[44]    *Glamm v. Allen*, 439 N.E.2d 390, 393 (N.Y. 1982) ("Since it is impossible to envision a situation where commencing a malpractice suit would not affect the professional relationship, the rule of continuous representation tolls the running of the Statute of Limitations on the malpractice claim until the ongoing representation is completed.").

[45]    *Id.* ("Neither is a person expected to jeopardize his pending case or his relationship with the attorney handling that case during the period that the attorney continues to represent the person.").

[46]    *Laird*, 828 P.2d at 698; *Janicki Logging & Constr. Co.*, 37 P.3d at 314; *Smith*, 482 S.E.2d at 120.

[47]    *Cawdrey v. Hanson Baker Ludlow Drumheller, P.S.*, 120 P.3d 605, 609-10 (Wash. App. 2005), *review denied,* 136 P.3d 758 (Wash. 2006).

reduced or eliminated entirely.[48]  For example, the District of Columbia Court of Appeals has explained that applying the continuous representation rule promotes respect for the attorney-client relationship even when the client knows of the attorney's mistake.  "A client may fully know his attorney has erred to his detriment, and still willingly place his confidence in the attorney's ability to correct the error."[49]

Another justification for delaying the accrual date is that clients are often in a poor position to evaluate the performance of their attorney during the course of the representation.[50]  Relatedly, some courts have pointed out that tolling removes an attorney's incentive to drag out a matter unnecessarily until the limitations period expires.[51]

Despite these benefits, some courts have rejected the rule.[52]  These courts often assert that statutes of limitations are within the purview of the legislature, not the

---

**48**　　*See Janicki Logging & Constr. Co*, 37 P.3d at 314; *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 770 (D.C. 1997); *Siegel v. Kranis*, 288 N.Y.S.2d 831, 835 (N.Y. App. Div. 1968).

**49**　　*R.D.H. Commc'ns, Ltd.*, 700 A.2d at 773.

**50**　　*Greene v. Greene*, 436 N.E.2d 496, 500 (N.Y. 1982) ("[T]he rule recognizes that a person seeking professional assistance . . . realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered."); *R.D.H. Commc'ns, Ltd.*, 700 A.2d at 769 (explaining that client cannot "be expected, in the normal course, to oversee or supervise the attorney's handling of the matter" (quoting *Greene*, 436 N.E.2d at 501)).

**51**　　*Siegel*, 288 N.Y.S.2d at 835; *Wall v. Lewis*, 393 N.W.2d 758, 763 (N.D. 1986).

**52**　　*See Clark v. Stover*, 242 A.3d 1253, 1256-57 (Pa. 2020); *Epstein v. Brown*, 610 S.E.2d 816, 819-20 (S.C. 2005), *overruled on other grounds by Stokes-Craven Holding Corp. v. Robinson*, 787 S.E.2d 485, 490-91, 493 (S.C. 2016).

courts.[53] Some opinions point to incompatibility with other law, like constitutional directives or absolute language in limitations statutes.[54]

We do not believe that adopting the continuous representation rule would overstep our authority. Inherent in every statute of limitations is the concept of accrual: the moment at which the limitations period begins to run.[55] Some statutes define when a claim accrues.[56] But our legislature has not expressly defined accrual for purposes of contract or tort claims.[57] It is left to the courts to determine when such claims accrue.[58] Accordingly, we have used the common-law discovery rule to determine when the

---

[53]    *See Clark*, 242 A.3d at 1256; *Epstein*, 610 S.E.2d at 819-20.

[54]    *Clark*, 242 A.3d at 1256 ("[T]he Pennsylvania Constitution specifically recognizes the historical and central role of the General Assembly in establishing limitations periods . . . ."); *Epstein*, 610 S.E.2d at 819-20 (relying in part on court's prior conclusion that legislature had "set absolute time restrictions" on malpractice actions).

[55]    *See, e.g.*, *Arnoult v. Webster*, 480 P.3d 592, 597 (Alaska 2020) (explaining that "[g]enerally, the statute of limitations starts to run on the date of injury" but that sometimes "accrual" is delayed).

[56]    *See, e.g.*, S.C. Code Ann. § 15-3-545(A), *cited in Epstein*, 610 S.E.2d at 819 (providing that medical malpractice actions "must be commenced within three years from the date of the treatment, omission, or operation giving rise to the cause of action or three years from the date of discovery of when it reasonably ought to have been discovered").

[57]    *See, e.g.*, AS 09.10.070 (providing that certain tort actions must be brought "within two years of the accrual of the cause of action"); AS 09.10.053 ("Unless the action is commenced within three years, a person may not bring an action upon a contract or liability, express or implied, except as provided in AS 09.10.040, or as otherwise provided by law, or, except if the provisions of this section are waived by contract.").

[58]    *See Young v. Embley*, 143 P.3d 936, 945 (Alaska 2006) ("Especially when statutory language and legislative history are ambiguous, we look to the common law as a useful tool to discern legislative intent and to interpret statutes." (footnote omitted)).

statute of limitations begins to run.[59] The continuous representation rule works in the same way. "Because the court has the authority to adopt the discovery rule as a way of defining accrual, there can be no doubt that the court has the authority to adopt the continuous representation rule, as an exception to the discovery rule, as a way of defining accrual in these cases."[60]

BHBC argues that adopting the continuous representation rule "would be inconsistent with Alaska's rule that a client only need be aware of some damages, not the full extent of damages, for a legal malpractice claim to accrue." BHBC cites to *Clark v. Stover*, in which the Supreme Court of Pennsylvania declined to adopt the continuous representation rule in part because the discovery rule and the fraudulent concealment doctrine already addressed many of the same concerns.[61]

We do not agree that these other rules make the continuous representation rule redundant. Equitable estoppel provides that when a party "fraudulently conceals from a plaintiff the existence of a cause of action," then that party "may be estopped [from pleading] the statute of limitation if the plaintiff's delay in bringing suit was occasioned by reliance on the false or fraudulent representation."[62] In other words, equitable estoppel applies when the delay in filing suit is the result of fraud.[63] But the policies behind the continuous representation rule — allowing the client to give the attorney a chance to fix the mistake without forgoing a malpractice suit — apply even

---

[59] *See generally Arnoult*, 480 P.3d at 597.

[60] *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 775 (D.C. 1997) (internal quotation marks and footnotes omitted).

[61] 242 A.3d 1253, 1256 (Pa. 2020).

[62] *Sharrow v. Archer*, 658 P.2d 1331, 1333 (Alaska 1983) (quoting *Chiei v. Stern*, 561 P.2d 1216, 1217 (Alaska 1977)).

[63] *See Williams v. Williams*, 129 P.3d 428, 432 (Alaska 2006) (providing elements of equitable estoppel, including fraudulent conduct and justifiable reliance).

when there has been no fraud by the attorney. The doctrines of fraudulent concealment and equitable estoppel do not obviate the need for the continuous representation rule.

We also disagree with BHBC's argument that the continuous representation rule is inconsistent with our rule that a limitations period begins to run when the claimant knows of some damages, even if not the full extent of the damages. True, that is the general rule for negligence and contract claims. But the continuous representation rule is a narrow exception based on policies specific to the attorney-client relationship.

On balance, we find the rationales for adopting the continuous representation rule more persuasive:

> The doctrine is fair to all concerned parties. The attorney has the opportunity to remedy, avoid or establish that there was no error or attempt to mitigate the damages. The client is not forced to end the relationship, though the option exists. This result is consistent with all expressed policy bases for the statute of limitations.[64]

Consequently, we conclude that the continuous representation rule applies to legal malpractice claims.

> **b.** **There is a genuine factual dispute about when Holly's malpractice claim accrued under the continuous representation rule.**

Next we consider whether, under the continuous representation rule, Holly's malpractice claim may be timely. Determining when legal representation terminates is in part a question of fact.[65] Despite the seemingly clear import of Holly's substitution of counsel, this question is complicated by the fact that BHBC continued

---

[64] *Janicki Logging & Constr. Co. v. Schwabe, Williamson & Wyatt, P.C.*, 37 P.3d 309, 314 (Wash. App. 2001) (quoting 3 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 22.13, at 431 (5th ed. 2000)).

[65] *See Nielsen v. Beck*, 69 Cal. Rptr. 3d 435, 440-43 (Cal. App. 2007); *Wall v. Lewis*, 393 N.W.2d 758, 763 (N.D. 1986).

to exchange emails with Holly into 2017, continued to serve as the attorney of record for Holly's family-owned business, and offered advice in June 2017 regarding a judgment entered jointly against Holly and her business. Given our "lenient standard for withstanding summary judgment,"[66] we conclude that Holly has produced sufficient evidence to raise a genuine issue of material fact precluding summary judgment.

As explained above, the continuous representation rule delays accrual of a legal malpractice claim until the end of the attorney's representation of the client in the same matter in which the alleged malpractice occurred.[67] But the rule has limits. It does not protect the "mere[] continuity of a general professional relationship."[68] For example, the rule would not toll the statute of limitations solely because the plaintiff later hired the defendant to work on a separate, factually distinct legal matter.[69]

A threshold question presented by this case is whether the continuous representation rule would apply if the evidence showed that BHBC ceased representing Holly personally but continued to represent her closely held business, SAS, in the same matter. SAS did not sue BHBC for malpractice. Only Holly did. BHBC argues that its representation of SAS is therefore immaterial to when Holly's malpractice claim accrued. But we disagree. Given the policies underlying the continuous representation

---

[66] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014) (quoting *Shaffer v. Bellows*, 260 P.3d 1064, 1069 (Alaska 2011)).

[67] *See, e.g.*, *Janicki Logging & Constr. Co.*, 37 P.3d at 313; *Muller v. Sturman*, 437 N.Y.S.2d 205, 207-08 (N.Y. App. Div. 1981); *see also* Cal. Civ. Proc. Code § 340.6(a)(2) (providing that statutes of limitations are tolled while "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred").

[68] *Muller*, 437 N.Y.S.2d at 207.

[69] *See, e.g.*, *Cawdrey v. Hanson Baker Ludlow Drumheller, P.S.*, 120 P.3d 605, 607 (Wash. App. 2005), *review denied,* 136 P.3d 758 (Wash. 2005) (declining to apply continuous representation rule when malpractice occurred in business transaction and plaintiff later hired defendant to assist with estate planning).

rule and statutes of limitation generally, a finding that BHBC continued to represent Holly's family business in the same matter in which it formerly represented Holly would postpone the accrual date of Holly's malpractice claim.

The policy behind the continuous representation rule is "to benefit the attorney/client relationship by granting the attorney the opportunity to mend or mitigate the error, if this is so decided by the client," without requiring the client to forgo a malpractice claim.[70] In other contexts, whether a business's attorney may be viewed as also representing an owner "relies heavily on the specific facts of the situation."[71] Holly and SAS were distinct clients of BHBC in the trust litigation. Yet Holly was one of only two owners of SAS (along with her husband), and she was the main client contact for BHBC's representation of SAS. Much of Holly's inheritance and livelihood were necessarily wrapped up in the outcome. The settlement agreement and attorney's fees judgment in the trust matter bound both Holly and SAS. Because Holly's interests were so closely wrapped up in SAS, injury to SAS was a significant injury to her as well. If Holly chose, as a co-owner of SAS and its main client representative, to allow BHBC to continue representing SAS in the trust litigation, then the continuous representation rule would seem to counsel against forcing her to undermine that relationship by bringing a direct malpractice claim before the relationship concluded.

In a similar vein, the policies behind statutes of limitations do not favor limiting the continuous representation rule strictly to BHBC's representation of Holly. "The purpose of statutes of limitations is to eliminate the injustice which may result from the litigation of stale claims."[72] It is hard to see how Holly's malpractice claim was "stale" if SAS's claim would have been timely. BHBC represented both Holly and

---

[70] *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 774 (D.C. 1997).

[71] Alaska Bar Ass'n Ethics Comm., Ethics Op. No. 2012-3, at 1 (2012).

[72] *Pedersen v. Zielski*, 822 P.2d 903, 907 (Alaska 1991) (citing *Johnson v. City of Fairbanks*, 583 P.2d 181, 187 (Alaska 1978)).

SAS in the settlement negotiations and mediation that is the basis for Holly's malpractice claims. SAS could assert the same malpractice claim that Holly asserted, involving the same allegations and evidence at issue in Holly's claim. If BHBC continued to represent SAS in the trust matter after February 11, 2017, then a malpractice claim by SAS against BHBC would have been timely when Holly filed her own claim. If it would not have been unjust to force BHBC to defend against SAS's malpractice claim, then it does not seem unjust to require BHBC to defend against Holly's similar (perhaps identical) claim that was actually filed.

Alaska "look[s] upon the defense of statute of limitations with disfavor and will strain neither the law nor the facts in its aid."[73] This maxim shapes our thinking on this issue. Under the unique facts of this case — when a person and the person's closely held business are represented by the same counsel, and counsel ceases to represent the person but not the business — continued representation of the business means the person's legal malpractice claim does not accrue until representation of the business in the same matter is terminated. Accordingly, if the evidence presented on summary judgment would allow a reasonable person to conclude that BHBC's representation of SAS in the trust matter had not terminated on or before February 11, 2017, then judgment should not be entered on statute of limitations grounds.

Therefore we must consider whether, in light of the evidence presented, a reasonable person could conclude that BHBC continued to represent SAS in the trust litigation after February 11, 2017.[74] A seminal New York case explained that the rule

---

[73] *Solomon v. Interior Reg'l Hous. Auth.*, 140 P.3d 882, 883 (Alaska 2006) (alteration in original) (quoting *Fred Meyer of Alaska, Inc. v. Adams*, 963 P.3d 1025, 1027 n.6 (Alaska 1998)).

[74] *See Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014) ("[T]he only questions to be answered at the summary judgment stage are whether a reasonable person could believe the non-moving party's assertions and

applies when there is "clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney."[75]  The relationship cannot be "sporadic," but instead must "involve[] a continuity of the professional services from which the alleged malpractice stem[med]."[76]  When deciding how long the representation continued, courts generally look to "evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship."[77]

When "the attorney has been formally substituted out as counsel, that act of substitution ordinarily ends the relationship."[78]  In many cases the attorney's withdrawal from a matter means representation has ended, so the malpractice claim accrues.[79]

But even when substitution of counsel occurs, subsequent events may create a factual dispute about whether the representation continued.[80]  In *Neilsen v. Beck* a California court of appeals concluded that three phone calls, documented on a billing

---

whether a reasonable person could conclude those assertions create a genuine dispute as to a material fact.").

[75]     *Muller v. Sturman*, 437 N.Y.S.2d 205, 208 (N.Y. App. Div. 1981).

[76]     *Id.*

[77]     *Worthington v. Rusconi*, 35 Cal. Rptr. 2d 169, 174 (Cal. App. 1994) (emphasis in original); *see McCoy v. Feinman*, 785 N.E.2d 714, 722 (N.Y. 2002).

[78]     *Shaoxing City Maolong Wuzhong Down Prods., Ltd. v. Keehn & Assocs., APC*, 190 Cal. Rptr. 3d 90, 96 (Cal. App. 2015); *see also* 3 RONALD E. MALLEN, LEGAL MALPRACTICE § 23:47 (5th ed. 2000) ("Ordinarily, an attorney's representation is not completed until the agreed tasks or events have occurred, the client consents to termination or a court grants an application by counsel to withdraw.").

[79]     *See, e.g.*, *Sladowski v. Casolaro*, 923 N.Y.S.2d 342 (N.Y. App. Div. 2011); *Sommers v. Cohen*, 790 N.Y.S.2d 141 (N.Y. App. Div. 2005).

[80]     *Nielsen v. Beck*, 69 Cal. Rptr. 3d 435, 440-43 (Cal. App. 2007); *see also Hensley v. Caietti*, 16 Cal. Rptr. 2d 837, 841 (Cal. App. 1993) ("The period of tolling should not turn upon the fortuity of the time of delivery of notice of discharge to counsel.").

statement, created a triable issue of fact on whether the representation continued beyond the date of the formal substitution of counsel, which had been executed several weeks earlier.[81] The billing statement was corroborated by the defendant's own deposition testimony, in which he testified that the calls pertained to negotiations strategy and the plaintiff's legal options.[82] The court concluded there was a genuine factual question as to whether these phone calls evidenced continued representation.[83]

Like the plaintiff in *Nielsen*, Holly points to a series of emails exchanged between her and Gross in the months after the formal substitution of counsel. She argues that the emails show that "an ongoing professional legal relationship continued after February 11, 2017 between Holly and [BHBC]." She contends that by concluding otherwise, the superior court failed to construe the evidence in a light most favorable to her.

Holly's argument is based on the emails she exchanged with Gross between January 2017 and June 2018. In January 2017, after the superior court ordered Holly and SAS to pay Robert's attorney's fees, Gross emailed Holly and her husband: "I am assuming that [Brecht] has spoken to you about the recent [superior court] order regarding costs and fees. If you have any other questions for me, as the attorney for SAS, please feel free to give me a call." On February 3 Gross received an email from Judge Sanders requesting a response to a filing by Robert. On February 5 Gross forwarded Judge Sanders's request and commented: "Because [Brecht] took the lead in the post-mediation case, I would suggest that he is in the best position to respond to Judge Sander[s]'s request. You also don't want to incur the expense of having two lawyers working on this matter." He concluded: "Please let us know what you would like us to do."

---

[81]    69 Cal. Rptr. 3d at 441-43.

[82]    *Id.*

[83]    *Id.* at 442.

In April 2017 Holly and Gross exchanged messages about a possible contract claim by SAS against Mountain House LLC. In response to questions from Holly, Gross summarized the proceedings in the trust case and then explained: "At this point, I am not sure I am the best person to represent you going forward. If you want to pursue a claim against Mountain House LLC, you should move quickly by securing a new lawyer before the Statute of Limitations runs." Around a week later, Holly sent an email urging Gross to prepare and file SAS's contract claim against MHLLC. Gross responded in a long email addressed to Holly in which he explained that he would not represent SAS in the contract case. He summarized each of the prospective claims and then explained why he believed they would be difficult to prove. In his message, Gross also elaborated on how the lawsuit against MHLLC could harm Holly personally because she had received a 1/3 share of MHLLC in the trust settlement.

In June Gross sent three more emails. The first notified Holly and her husband that Robert had filed a motion with Judge Sanders to amend the judgment in the trust case. The judgment had previously been entered jointly against SAS and Holly. Gross explained:

> Robert's lawyers have filed a motion seeking to amend the judgment (see attached). They want to add the award handed down by Sanders and the $25,000 that was in the settlement. The latter makes no sense because if the $25,000 is to be included then all the other items set forth in the settlement should likewise be included.
>
> Anyway, someone needs to oppose this motion. Up to this point, [Brecht] has been doing this work, so I am assuming that [Brecht] will step in and do this work. If not, please let me know.

Around a week later, Gross reminded Holly and her husband that the opposition was due. In the third email three days later, Gross stated that he had "taken no steps to oppose the motion, as you have another lawyer who is responsible for doing so."

BHBC asserts that these emails show only "professional courtesy" and communication on "collateral issues." BHBC can also point to its email to Holly in the fall of 2016 stating that while it was "technically" still the attorney of record for SAS in the superior court, BHBC's continued participation was "unnecessary" and Gross would be "closing [his] file" as evidence that its representation of SAS was not "ongoing" or "continuous." But when these emails are viewed in the light most favorable to Holly, there remains a genuine dispute whether, despite BHBC's formal withdrawal from representing Holly in the litigation personally, there was still an "ongoing, continuous, developing and dependent relationship between" BHBC and SAS that did not terminate before February 5, 2017.[84] If there was such a relationship, then under the continuous representation rule Holly's malpractice claim was not untimely. Therefore we reverse the superior court's grant of summary judgment to BHBC on statute of limitations grounds.

### 3. It was not error to rule on summary judgment that BHBC is not estopped from pleading the statute of limitations.

Holly next argues that BHBC and its attorneys should have been equitably estopped from asserting the statute of limitations as a defense because they fraudulently concealed several conflicts of interest from her. The superior court held that BHBC was not estopped because Holly failed to produce evidence showing that BHBC had a conflict of interest. We affirm the superior court's ruling for a different reason: Holly failed to present evidence that she reasonably delayed filing suit in reliance on BHBC's failure to disclose alleged conflicts of interest.

If a party "fraudulently conceals from a plaintiff the existence of a cause of action," then that party "may be estopped [from pleading] the statute of limitation if the plaintiff's delay in bringing suit was occasioned by reliance on the false or

---

[84] *Muller v. Sturman*, 437 N.Y.S.2d 205, 208 (N.Y. App. Div. 1981).

fraudulent representation."[85]  "To establish equitable estoppel, the plaintiff must show (1) fraudulent conduct, which may take the form of either an affirmative misrepresentation or a failure to disclose facts where there is a duty to do so; (2) justifiable reliance; and (3) damage."[86]  The plaintiff must show that he or she reasonably relied upon the fraudulent conduct "when forbearing from suit."[87]

It was BHBC's burden, as the party moving for summary judgment, to present evidence that Holly's claim was not filed within the statute of limitations.[88]  But once BHBC presented this evidence, it was Holly's burden to rebut BHBC's right to judgment by presenting evidence to support her estoppel defense.[89]

Holly argues that BHBC acted fraudulently by concealing its conflicts of interest from her, and that these conflicts were "behind [BHBC] selling out Holly in their private 'mediation' proceedings and afterwards."  Whether Holly's argument succeeds hinges on whether BHBC had a duty to disclose these alleged conflicts to Holly and failed to do so, and whether Holly justifiably relied on these alleged omissions in failing to file suit before the limitations period expired.  She points to two

---

[85]     *Sharrow v. Archer*, 658 P.2d 1331, 1333 (Alaska 1983) (quoting *Chiei v. Stern*, 561 P.2d 1216, 1217 (Alaska 1977)).

[86]     *Williams v. Williams*, 129 P.3d 428, 432 (Alaska 2006).

[87]     *Park v. Spayd*, 509 P.3d 1014, 1020-21 (Alaska 2022) (quoting *Gudenau & Co. v. Sweeney Ins., Inc.*, 736 P.2d 763, 769 (Alaska 1987)).

[88]     *See Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014) ("[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no [genuine] disputed issues of material fact and that the moving party is entitled to judgment as a matter of law." (alterations in original) (quoting *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 n.25 (Alaska 2008))).

[89]     *See id.* ("Once the moving party has made [their] showing, the burden shifts to the non-moving party 'to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists.' " (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978))).

alleged conflicts: (1) BHBC's representation of what we refer to as the "PT entities," a group of corporate entities connected with Robert; and (2) BHBC's representation of SAS's competitor, K2 Aviation.[90]

The flaw in Holly's argument is that she did not present evidence showing that she reasonably relied on the alleged nondisclosures in failing to file suit before the limitations period expired. In response to an affidavit from Gross stating that he informed Holly that BHBC had previously represented K2 Aviation, Holly asserted that "there was a substantial amount of material information about that work that the defendants did not provide to me." Holly went on to explain that she "did not learn of all the elements of a conflict of interest until October 17, 2018, when I was told about this by another attorney, not connected with [BHBC]." She asserted that "[i]t was only when I learned facts showing that I actually had a claim against [BHBC] that the statute of limitations began to run, and I did not learn all of those facts based on the limited information that [BHBC] provided to me." According to Holly, despite BHBC's failure to disclose sufficient information about the alleged conflict, she became sufficiently aware of it in 2018 — still within the limitations period. There is no evidence explaining why, despite this new awareness of the alleged conflict, she did not file suit for roughly another 18 months. Therefore she failed to present evidence that her filing beyond the limitations period was in reasonable reliance on BHBC's failure to disclose its alleged conflict with K2.

---

[90] In Holly's opening brief she also alleges that BHBC was conflicted because it served as "bond counsel" for the Alaska Industrial Development and Export Authority, for which Robert sat on the board of directors. But Holly waived this argument by not timely raising it in the superior court. She did not raise it in her oppositions to summary judgment or in her motion to amend the complaint. The first time she raised this allegation was in an opposition to entry of final judgment, after the superior court granted summary judgment in favor of BHBC.

The alleged conflict based on PT entities suffers from a similar deficiency. Holly's affidavit states that in September 2018, she "researched what happened" by entering Robert's name in the State's business license database and discovered that BHBC performed legal work for corporate entities affiliated with Robert. As with the asserted K2 conflict, Holly does not explain why she waited until February 2020 to file suit against BHBC. Because she presented no evidence that she reasonably relied on BHBC's failure to disclose the alleged conflict in forbearing from suit, the superior court did not err in granting summary judgment in BHBC's favor on equitable estoppel.

## B. It Was Error To Deny Holly Leave To File An Amended Complaint.

Holly challenges the superior court's order denying her motion for leave to amend her complaint. Before the court entered summary judgment, Holly moved for leave to amend her complaint to add allegations related to her conflict-of-interest theories. Her amended complaint added a new theory of damages — disgorgement of fees based upon BHBC's alleged conflicts with K2 Aviation and the PT entities. Holly cited precedent indicating that if BHBC had an undisclosed conflict of interest while representing her, she would be entitled to a refund of her attorney's fees.[91]

The court denied the motion when it granted BHBC's first motion for summary judgment. The court stated that because Holly's conflict-of-interest claims were "legally insufficient for the reasons" it granted summary judgment against her, amendment was denied. Although it is not entirely clear, it appears the court denied amendment based on its ruling that there were no conflicts of interest involving the PT entities and K2. Because factual disputes prevented the superior court from reaching

---

[91] *Moses v. McGarvey*, 614 P.2d 1363, 1372 (Alaska 1980) ("It is well established that an attorney, disqualified on conflict-of-interest grounds, generally is barred as a matter of public policy from receiving any fee from either of the opposed interests.").

this conclusion on summary judgment, we vacate the court's denial of leave to amend and remand for further proceedings.

We have "long held that leave to amend a pleading should be freely given and that, absent a showing that the amendment would have resulted in injustice, a trial court will be found to have abused its discretion in denying a motion to amend."[92] "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [the plaintiff] ought to be afforded an opportunity to test [the] claim on the merits."[93] But "if an amendment would be futile because it 'advances a claim or defense that is legally insufficient on its face,' it is appropriate for a superior court to deny leave to amend."[94] In deciding whether an amendment would be futile, we must "presume all factual allegations of the complaint to be true and [draw] all reasonable inferences" in favor of the complainant.[95] We review whether amendment would be futile using our independent judgment.[96]

In this case the superior court effectively applied the summary judgment standard to Holly's motion to amend her complaint.[97] The correct approach was to

---

[92]     *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1039 (Alaska 2004).

[93]     *Lingley v. Alaska Airlines, Inc.*, 373 P.3d 506, 513 (Alaska 2016) (alterations in original) (quoting *Miller v. Safeway, Inc.*, 102 P.3d 282, 295 (Alaska 2004)).

[94]     *Krause v. Matanuska-Susitna Borough*, 229 P.3d 168, 176-77 (Alaska 2010) (quoting *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 287 (Alaska 2004)).

[95]     *Id.* at 178 (quoting *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.3d 1009, 1014 (Alaska 1999)).

[96]     *Id.* at 174-75.

[97]     Notably, BHBC did not oppose Holly's motion to amend her complaint. It took the position that "the proper procedural mechanism" to deal with Holly's motion for leave to amend was to "allow her to file" the new complaint so that the court could consider its merits on summary judgment.

"presume all factual allegations of [Holly's] complaint to be true"[98] and then analyze the futility of the amended complaint "on its face."[99]  But even if we evaluate Holly's conflict of interest claims against the evidence presented in summary judgment briefing and apply the summary judgment standard, we disagree with the court's conclusion that the conflict of interest claims were futile.

### a.    Alleged PT entities conflict

Holly alleges that BHBC had a conflict of interest because, at the time it represented her against Robert, it also performed legal work for corporate entities connected with Robert called the "PT entities."  When BHBC moved for summary judgment on statute of limitations ground, it presented evidence about this alleged conflict in an attempt to refute Holly's argument that it should be estopped, by virtue of this conflict, from pleading the statute of limitations.  The superior court ruled that the evidence established as a matter of law that no conflict existed.  We disagree with that conclusion.

Under Alaska Rule of Professional Conduct 1.7(a), an attorney has a concurrent conflict of interest if:

(1) The representation of one client will be directly adverse to another client; or

(2) There is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.[100]

Two representations are "directly adverse" where the lawyer "act[s] as an advocate in one matter against a person the lawyer represents in some other matter, even when the

---

    **98**    *Krause*, 229 P.3d at 178  (quoting *Belluomini*, 993 P.3d at 1014).

    **99**    *Hallam*, 91 P.3d at 287  (quoting *Taylor v. Johnston*, 985 P.2d 460, 464 (Alaska 1999)).

    **100**    Alaska R. Prof. Conduct 1.7(a).

matters are wholly unrelated."[101]  But "[e]ven where there is no direct adverseness," a conflict of interest will still exist when "there is a significant risk" that the lawyer's ability to carry on the representation "will be materially limited as a result of the lawyer's other responsibilities or interests."[102]  The "mere possibility of subsequent harm does not itself require disclosure and consent."[103]  Instead the "critical questions" are "the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment."[104]

Holly's brief raises two potential conflicts.  First, she asserts that BHBC's work for the PT entities created an attorney-client relationship with Robert.  This implies that BHBC represented two clients who were directly adverse.  Second, she argues that BHBC would not risk alienating her brother, who had given BHBC legal work in the past through his role with the PT entities.  This implies that BHBC was "materially limited" in its representation of Holly.  Gross's affidavit indicates that BHBC ceased representation of the PT entities in 2016, the year after Holly's mediation in the trust case.  So either of Holly's theories, if proven, would establish a concurrent conflict that required BHBC to obtain Holly's informed consent.

Holly first raised the issue of the PT entities in her opposition to BHBC's second motion for summary judgment.  She attached an affidavit and several documents from the Department of Commerce.  Holly's affidavit asserted that a different BHBC attorney (not Gross or Michaletz) had helped to organize several entities with which Robert was affiliated.  The attached documents indicate that this attorney filed articles of organization and biennial reports for several LLCs associated with Robert.  The records also indicate that Robert was the registered agent for one of these entities and

---

[101]    *Id.* cmt. [6].

[102]    *Id.* cmt. [8].

[103]    *Id.*

[104]    *Id.*

that in 2013 Robert was a 5% owner of an entity named "Platinum Holding Company LLC." Holly later filed a chart that she had made indicating that the successor entity to Platinum Holding Company LLC owned a series of other entities for which the BHBC attorney had performed legal work.

In response to these allegations, Gross provided an affidavit. Gross described BHBC's work for the PT entities. According to Gross, BHBC began representing "Platinum Capital Advisors, LLC" in 2012 and ended the representation in April 2016. The work consisted of "creating various companies affiliated with [Platinum Capital Advisors], including filing Articles of Incorporation, registering names, securing business licenses, filing biennial reports, and advising on general corporate law." According to Gross, the other BHBC attorney did "the vast majority" of the work, and neither Gross nor Michaletz "ever did work for [Platinum Capital Advisors] or its affiliated companies."

Gross's affidavit revealed that Robert had been the chief financial officer of Platinum Syndicate, LLC, and chief executive officer of PT Infrastructure, LLC, two of the affiliated companies. He described a "few limited occasions" where BHBC had direct email contact with Robert in 2013, including (1) while assisting Robert in drafting a "finder's fee agreement," and (2) while helping Robert to set up PT Infrastructure, LLC. The affidavit did not identify any communications relating to Robert's rights or interests as an individual. The affidavit also described several instances of indirect contact with Robert. In 2013, BHBC helped change the name of Platinum Syndicate, LLC, and Robert was copied on the emails but did not actively participate. That same year BHBC helped prepare a biennial report for Platinum Holding Company, of which Robert owned 5%. But Robert was not BHBC's point of contact for filing this report.

Gross's affidavit also indicates that toward the end of 2013 BHBC represented PT Infrastructure, LLC, in preparing Robert's employment contract for his role as chief executive officer. According to Gross's affidavit, this representation "makes clear that BHBC had no attorney-client relationship with Robert, as [BHBC

7757

was] adverse to him in the drafting on his employment agreement." Gross attested that one month later "Arctic PT Trust" replaced Robert's interest in Platinum Holding Company, and BHBC had "no more involvement with Robert, either directly or indirectly."

In a later affidavit, Holly asserted that she "disagree[d] with some of the facts" in Gross's affidavit. She claimed that Gross's affidavit almost exclusively discussed Platinum Capital Advisors but that this was "far from the only relevant entity." She claimed Arctic PT Trust (the entity that replaced Robert's interest in the holding company) is owned "largely or entirely" by Robert, and that this trust was a 20% owner of PT Holding Company, LLC. She also asserted that, according to the PT entities' website, Platinum Capital Advisors controls and manages over $3.7 billion dollars. She concluded by asking the court for additional time to seek information on Robert's ability to steer the PT entities' legal work to BHBC. In an accompanying filing, Holly asked for an Alaska Civil Rule 56(f) continuance.[105]

Although the undisputed facts show that Robert was not BHBC's client, there is a genuine factual dispute material to whether there was a significant risk that BHBC's attorneys were materially limited by Robert's role in companies affiliated with their client, Platinum Capital Advisors.

There is no genuine factual dispute relevant to whether Robert personally was BHBC's client. According to Gross's affidavit, BHBC's primary points of contact at Platinum Capital Advisors were two individuals other than Robert Sheldon. Gross stated that "[i]n those instances where BHBC represented companies affiliated with [Platinum Capital Advisors], the client would be the affiliated company, but not those

---

[105]    *See* Alaska R. Civ. P. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.").

individuals associated with the affiliated companies, as the work was always directed through" the same two named individuals. According to Gross, "all of the invoices for legal work done were always sent to [Platinum Capital Advisors], despite the fact that the work may have benefitted an affiliated company." BHBC only directly conversed with Robert about negotiating a "finder's fee" agreement for one entity and about setting up another. Holly's affidavit does not present "specific facts . . . reasonably tending to dispute or contradict"[106] Gross's account of the limited nature of these contacts. Holly's affidavit describes relationships between Platinum Capital Advisors and various other "PT entities," as well as Robert's ownership interest in some of these entities, but does not dispute the specific facts asserted by Gross.

Given the undisputed evidence, Robert was not BHBC's client. Whether a business's attorney may be viewed as also representing a shareholder "relies heavily on the specific facts of the situation."[107] "As a general rule, representation of the organization does not also imply representation of an individual owner or owners."[108] "[W]hen an owner of a closely held organization, acting in a capacity as a representative or 'constituent' of the organization, consults with the organization's attorney, receives legal advice or provides confidential information no attorney-client relationship is formed with the constituent."[109] "However, a conflict can arise if the attorney has represented an individual owner in other legal matters or in such a way that might cause that individual to believe that the attorney was acting on his or her separate behalf."[110] The evidence in the record shows (1) that BHBC performed legal work for entities in

---

[106] *Societe Fin., LLC v. MJ Corp.*, 542 P.3d 1159, 1166 (Alaska 2024) (quoting *Shaffer v. Bellows*, 260 P.3d 1064, 1069 (Alaska 2011)).

[107] Alaska Bar Ass'n Ethics Comm., Ethics Op. No. 2012-3, at 1 (2012).

[108] *Id.*

[109] *Id.* at 3.

[110] *Id.* at 1.

which Robert had a partial ownership interest, (2) that Robert was an executive of two of the entities that BHBC represented, and (3) that BHBC personnel had email contact with Robert regarding matters within the scope of Robert's role as an employee. This evidence does not establish an attorney-client relationship between Robert and BHBC because the scope of BHBC's representation did not extend beyond its representation of the entities.

However, the evidence does not establish that BHBC was entitled to judgment on the question of whether it was materially limited by its relationship to Robert when representing Holly against him. Although Holly raised the issue of material limitation conflict in her summary judgment briefing, the superior court did not address it when analyzing equitable estoppel. And BHBC does not squarely address the possibility of a material limitation conflict in its briefing to us.

Law firms are businesses with financial incentives. Representing one client against a person or entity connected with another client may, in some circumstances, be so contrary to a firm's financial interests that there arises "a substantial risk" that the attorney will be "materially limited" in representing the first client.[111] For example, the Restatement (Third) of the Law Governing Lawyers indicates that when half of a firm's business consists of work for a corporate affiliate of the opposing party, the client could reasonably believe that the attorney's concern about a possible adverse reaction by the affiliate will inhibit the attorney's pursuit of the client's case.[112]

---

[111] *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 cmt. d., illus. 8 (AM. L. INST. 2000).

[112] *Id.*

Under the "material limitation" standard, BHBC's evidence, though largely undisputed, does not show it is "entitled to judgment as a matter of law."[113] BHBC's evidence shows that: (1) it performed legal work on behalf of Platinum Capital Advisors and affiliated corporate entities between 2012 and 2016; (2) its primary contacts for this work were persons other than Robert; (3) Robert was an executive of at least one of the entities affiliated with Platinum Capital Advisors; (4) although some BHBC lawyers had interactions with Robert, neither Gross nor Michaletz "ever did work for [Platinum Capital Advisors] or its affiliated companies"; and (5) BHBC's direct contact with Robert ceased in 2013, before BHBC was engaged by Holly. Holly's evidence did not dispute these specific facts, but asserted that Robert indirectly owns a significant share of some of the entities for which BHBC performed legal work.

BHBC's evidence failed to establish as a matter of law that there was no significant risk of material limitation. According to the Restatement example noted above, a significant risk of material limitation could exist if: (1) BHBC's revenues from legal work for Platinum Capital Advisors and its affiliates were significant; (2) Robert had or appeared to have the ability to influence whether this work continued to flow to BHBC; and (3) Gross and Michaletz knew of this legal work and Robert's affiliation with those clients.[114] If those facts were true, that could establish a significant risk that Holly's lawyers would be materially limited in zealously prosecuting her case against Robert, lest they offend him and jeopardize their firm's financial interests in continuing to work for companies affiliated with him. BHBC's evidence does not squarely address

---

[113] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014).

[114] *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 cmt. c(iv) ("The propriety of the lawyer's action should be determined based only on facts and circumstances that the lawyer knew or should have known at the time of undertaking or continuing a representation.").

those factual issues.[115]  When BHBC's evidence is viewed in the light most favorable to Holly, it fails to establish as matter of law that there was no significant risk of material limitation.

Therefore, we cannot say that Holly's disgorgement claim based on an alleged conflict with PT entities is futile.  For this reason it was an abuse of discretion to deny her leave to amend her complaint by adding this claim.

### b.  Alleged K2 Aviation conflict

Holly also argues that BHBC was operating under a conflict of interest when she asked her lawyers to subpoena K2 Aviation, whom BHBC had represented in other matters, and they declined.  The superior court reasoned that representing competing businesses in "separate legal matters that are completely discrete" does not create a conflict.  But if BHBC was unwilling to subpoena K2's records, as Holly claims, that raises the question of whether BHBC's former client relationship with K2 materially limited its representation of Holly.[116]  The evidence does not show as a matter of law that there was no significant risk that BHBC's attorneys were materially limited by their relationship with K2 when representing Holly.

---

[115]    Gross's affidavit states that when BHBC ran a conflict check in 2014 prior to representing Holly, "there would have been no 'hits' for the name 'Robert Sheldon,' which cleared the way for BHBC to represent Sheldon Lee in her case against her brother."  But the affidavit does not state that Gross and Michaletz were unaware of the legal work their colleagues were doing or of Robert's affiliation with those clients.

In Gross's 2014 letter in response to Robert Sheldon's suggestion of a conflict Gross stated that he "ha[d] no idea what conflict you are talking about" and speculated that the asserted conflict might pertain to Robert's wife's role at a private school.  But drawing reasonable inferences in favor of Holly, Gross's statement that he had "no idea" what conflict Robert was "talking about" does not necessarily mean that Gross was unaware of Robert's relationship to corporate entities for which BHBC did legal work.

[116]    Alaska R. Prof. Conduct 1.7(a) (providing that concurrent conflict of interest exists if lawyer is materially limited by responsibilities to other client or former client).

Evidence related to BHBC's representation of K2 can be found in an email from Gross to Chris Brecht, the attorney Holly retained after the mediation. In this email Gross states that K2 is a "former client" for which BHBC's Washington, D.C. office "did some governmental affairs work" in October and November of 2014. Gross emphasized in the email that because K2 was a former client, there was "nothing ethically preventing [him] from representing a client interested in filing suit against K2, nor would [he] be ethically precluded from serving K2 with a subpoena" because the subpoena would be unrelated to the work performed by the D.C. office. Gross also emphasized that he had "no relationship with K2 whatsoever." Gross did, however, state that he advised Holly about the representation before her complaint against Robert was filed. He also "explained to Holly that if she wanted to file an action against K2 she should probably find different counsel." Gross told Brecht that Holly elected to stay with BHBC.

In his affidavit, Gross offered additional details about the representation of K2, and his response to Holly's desire to subpoena K2's records. Gross stated that he told Holly there was "no way K2 would agree to produce a copy of those records because of th[eir] sensitive and competitive nature" and that K2 would likely succeed in quashing the subpoena. Gross also asserted that BHBC's representation of K2 had been "regulatory," so there "would be nothing stopping [him] from subpoenaing records from K2, [he] just determined that it was a bad idea."

In light of the Restatement illustration described above, this evidence does not establish as a matter of law that Gross had no conflict of interest arising out of his firm's former representation of K2. There is no evidence about whether BHBC's revenues from representing K2 were significant or whether the relationship was likely to continue. And Gross himself advised Holly that, if she wanted to sue K2, she should find another lawyer.

The evidence was also disputed as to whether BHBC sufficiently disclosed this asserted conflict. Holly's affidavit states that "although Mr. Gross did

inform me that Birch Horton had done some work for K2 Aviation, there was a substantial amount of material information about that work that the defendants did not provide me."

Therefore, we cannot say that Holly's disgorgement claim based on an undisclosed conflict of interest involving K2 was futile. It was an abuse of discretion to deny her leave to amend her complaint to add this claim.

## V. CONCLUSION

We REVERSE the superior court's grant of summary judgment, REVERSE the superior court's denial of leave to amend the complaint, VACATE the attorney's fee award, and REMAND for proceedings consistent with this opinion.